**STANDARD OIL COMPANY, Plaintiff,**

v.

**MONTEDISON, S.p.A., et al., Defendants.**

**PHILLIPS PETROLEUM COMPANY, Plaintiff,**

v.

**MONTEDISON, S.p.A., et al., Defendants.**

**E. I. du PONT de NEMOURS & CO., Plaintiff,**

v.

**MONTEDISON, S.p.A., et al., Defendants.**

Civ. A. No. 4319.

United States District Court, D. Delaware.

Feb. 25, 1977.

On Motion for Clarification and Reargument—May 4, 1977.

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, Del., John Kelton, Thomas V. Heyman and Maxim H. Waldbaum, of Watson, Leavenworth, Kelton & Taggart, New York City, Arthur G. Gilkes, Chicago, Ill., Thomas F. Reddy, Jr., Gerald J. Flintoft and Stanton Lawrence, III, of Pennie & Edmonds, New York City, for Standard Oil Co. (Indiana).

C. Waggaman Berl, Jr., Wilmington, Del., Sidney Neuman and Harry J. Roper, of Neuman, Williams, Anderson & Olson, Chicago, Ill., Eugene E. Innis and Donald J. Quigg, of Bartlesville, Okl., for Phillips Petroleum Co.

Roger A. Hines and Earl Handley, of Legal Department, Du Pont Co., Wilmington, Del., Louis F. Reed, Fish & Neave, New York City, for E. I. du Pont de Nemours & Co.

Edmund D. Lyons, of Morris, James, Hitchens & Williams, Wilmington, Del., George B. Finnegan, Jr., Jerome G. Lee, David H. Pfeffer, Alfred P. Ewert and Stephen R. Smith, of Morgan, Finnegan, Pine, Foley & Lee, New York City, for Montedison, S.p.A.

CALEB, M. WRIGHT, Senior District Judge.

Once again this Court must consider whether plaintiffs in this action may be allowed to amend their complaints [1] to add allegations of fraud and inequitable conduct by the defendant in connection with an interference proceeding in the Patent Office. When the motions were first presented in 1975, this Court held that the only issues properly triable in an appeal from a decision of the Board of Patent Interferences under 35 U.S.C. § 146 were those issues which had been presented to the Board. Since plaintiffs' motions sought to add issues which had not been raised before the Board, the motions were denied.[2] Appeals were taken by plaintiffs from that interlocutory order to the Third Circuit Court of Appeals, upon certification by this Court pursuant to the provisions of 28 U.S.C. § 1292(b).[3]

The Third Circuit, in a decision by Judge Maris, held that the District Court may, in the exercise of sound discretion, permit some issues of fraud and inequitable conduct to be raised for the first time in a § 146 proceeding, if the alleged fraudulent or inequitable conduct relates to the factual issues of priority—the "question as to which of the parties involved in the interference actually first used the device or process of

1. There are four separate actions involved here which have been consolidated. In each of these actions, only one party is a plaintiff and all other parties are defendants, but for convenience, all losing parties to the interferences are herein labeled plaintiffs and their pleadings are referred to as complaints. Montedison will always be referred to as the defendant.

2. *Standard Oil Company of Indiana v. Montedison, S.p.A.*, 398 F.Supp. 420 (D.Del.1975).

3. The Circuit Court, in granting the applications for appeal, ordered that the briefs of the parties be directed solely to the following question:

When petitioners bring an action before a district court pursuant to 35 U.S.C. § 146, may the district court determine whether the respondent acted fraudulently in the proceeding before the Board of Patent Interferences, even though that issue was not raised before that Board?

invention".[4] In the exercise of its discretion, the Court may consider, inter alia, "whether there was suppression, bad faith or gross negligence on the part of the plaintiff . . . whether the issue has been or may be more conveniently and expeditiously raised in another judicial proceeding", and whether the result would be manifestly unjust to any of the parties.[5]

The proposed amendments are now before this Court on remand, to be reconsidered in light of Judge Maris' opinion. The parties have submitted to the Court specifications of all evidence which would be relied on in support of or in opposition to the amendments. The Court has reviewed that evidence and heard oral argument of the parties.

## I. Background of Action

The history of this litigation has been ably summarized in Judge Maris' opinion, but a brief review of the context of the present motion is necessary to elucidate the contentions of the parties. On September 9, 1958, the interference from which the present appeals were taken was declared by the Board of Patent Interferences. The count in interference, as amended, covered "normally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content". For the purpose of the interference, Montedison's assignors, Natta, et al., were awarded senior party status and the remaining parties junior party status on the basis of the following filing dates:

| Applicants | Assignee | Serial No. | Filing Date |
|---|---|---|---|
| Natta, et al. | Montedison | 514,099 | June 8, 1954[6] |
| Baxter, et al. | du Pont | 556,548 | August 19, 1954 |
| Zletz | Standard Oil of Indiana | 462,480 | October 15, 1954 |
| Vandenberg[7] | Hercules | 523,621 | April 7, 1955 |
| Hogan & Banks | Phillips | 558,530 | January 11, 1956 |

The interference proceeding generated an extensive and complex record over its 13-year span. On November 29, 1971, the Board finally awarded priority of invention to the senior party, Natta, et al. U.S. Patent No. 3,715,344 was issued to Montedison on the Natta, et al. application on February 6, 1973.

While the interference proceeding was pending in the Patent Office, Montedison (as assignee of Natta, et al.) filed a divisional application of the application in interference covering a species of isotactic crystalline polypropylene. Although the divisional application was stayed at one point because of the pending interference, the prosecution was resumed and the application granted on November 26, 1963, as U.S. Patent No. 3,112,300 (the " '300 patent").

Between 1965 and 1968, Montedison instituted a number of infringement actions on the basis of the '300 patent against, inter alia, some of the parties involved in the interference.[8] The infringement actions were all consolidated in this Court. Shortly before trial, but after extensive discovery had been undertaken by all parties, the infringement actions were settled. Prose-

---

4. *Standard Oil Co. of Indiana v. Montedison, S.p.A.*, 540 F.2d 611, 617 (3rd Cir. 1976).

5. *Id.*

6. The U.S. Filing Date of the Natta, et al. application was June 8, 1955, but it was accorded the benefit of the 1954 date on the basis of an Italian application filed on that date.

7. Vandenberg is no longer involved in this litigation, as the Board of Patent Interferences rendered judgment on the issue of priority against Vandenberg on October 6, 1954. Hercules was a named defendant in this § 146 action on the basis of that denial, but judgment by default was entered against it on September 1, 1972.

8. The defendants in the infringement actions included, inter alia, Dart Industries, Inc., Chevron Chemical Co., Exxon Corp., Avisun Corp., Eastman Kodak Co., Diamond-Shamrock Corp., Phillips Petroleum Co., and Amoco Chemicals Corp.

cution of the § 146 action, which had been stayed pending resolution of the infringement actions, was resumed in March, 1975. The present motions to amend to include allegations of fraud and misconduct, which were filed soon afterwards, were based largely on evidence uncovered during discovery in the '300 infringement litigation. Most of that evidence relates to conduct by Montedison during the prosecution of the '300 patent which plaintiffs allege materially affected the proceedings in interference.

## II. *Scope of Third Circuit Opinion*

█ Judge Maris' opinion places two limitations on the exercise of this Court's discretion. First, where the alleged fraud or misconduct is raised for the first time in a § 146 proceeding, it must relate to the historical date of priority of one of the parties. The evidence sought to be introduced must, therefore, tend to prove or disprove a prior date of invention for one of the parties. If the alleged fraud does not relate in any fashion to a date of invention, but only to the "right of the party perpetrating it to receive a patent", the matter is one for consideration by the Commissioner of Patents and not by this Court.

The Court considers this holding to dispose of plaintiffs' "standing" contentions. Plaintiffs argue, inter alia, that the interference would have been dissolved as to Natta, et al. on the grounds of lack of originality or patentability over prior art if the alleged fraud had been raised before the Board of Patent Interferences, and that consequently Montedison would no longer be involved in the interference and would have no standing to raise the issue of priority here. While logically appealing, that argument misconstrues the limits of Judge Maris' opinion. The alleged unpatentability or lack of originality of Natta, et al.'s invention cannot possibly affect whether or not, by a given date, Natta, et al. had

conceived and reduced the invention to practice. In this § 146 proceeding, where the issue of fraud was not presented to the Board, the only fraud which may be considered is that which bears on the actual date of invention of any of the parties. Thus, the Court, even in the exercise of its discretion, could not allow plaintiffs to include allegations of fraud or inequitable conduct which may be relevant *only* to the question of patentability over prior art or originality.

█ Second, the fraud or inequitable conduct must have "infected the interference proceeding". In most cases of fraud or inequitable misconduct in the Patent Office, the alleged fraud occurred during prosecution of the patent in suit or before the Examiner in Interference or the Board of Interferences. Much of the fraud alleged in these actions supposedly took place in a separate proceeding, the prosecution of the '300 patent. Accordingly, Montedison has objected to the introduction of any alleged fraud or misconduct which occurred during the ex parte prosecution of the '300 patent on the ground that the fraud could not have affected the interference proceeding.

The Court is unwilling to exclude introduction of the fraud issues solely on that basis. This is in many ways an exceptional case. Because the art of the divisional application was so closely related to that of the application in interference, Montedison had the opportunity to make representations and arguments on an ex parte basis which would be relevant to the issues in interference. Apparently some of those representations and arguments were made ex parte to examiners who later were involved in the interference in some capacity.[9] If plaintiffs can establish that the fraud or misconduct allegedly committed during the '300 patent prosecution possibly could have affected the ultimate decision on pri-

9. It is not clear from the record exactly how or when these particular examiners were involved in the interference and consequently what impact Montedison's misrepresentations could have had on the final decision. The fact that there was an overlap, however, is enough to raise suspicion that the decision might have been affected by representations made during the prosecution of the '300 patent.

ority, that fraud or misconduct would be within the scope of discretionary admissible issues outlined in Judge Maris' opinion.

### III. Contentions of the Parties

■ For analytical purposes, the claims of fraud and misconduct advanced by plaintiffs can be categorized broadly as: (1) misrepresentations of or failure to reveal relevant information; and (2) abuse of Patent Office procedures in order to unduly influence examiners.[10] The first category embraces allegations which fit within the traditional framework of fraudulent misrepresentations:

(a) that Montedison misrepresented or failed to reveal to the Patent Office the results of comparative tests performed by Montedison according to the applications of the other parties or to patents not involved in the interference;

(b) that Montedison misrepresented the origin, characteristics and utility of comparative polypropylene samples shown to the Patent Office; and

(c) that Montedison made false or misleading statements to the Patent Office with respect to the relationship between applicants and Karl Ziegler[11] and the originality of the invention.

The second category presents more novel claims. All of plaintiffs allege, in part, that Montedison intended to use, and did use, the ex parte prosecution of the '300 patent to improperly influence or "brainwash" examiners who later sat in interference, into giving inordinate weight to Montedison's arguments and representations. Typical of these contentions is that advanced by Standard Oil:

An essential part of Montedison's strategy was the repeated use of ex parte, off-the-record interviews in Montedison's numerous pending applications as forums in which to present, without challenge, information which bore directly on the inter partes issues of Interference 89,634.[12]

Plaintiffs contend that this pattern of misconduct affected every phase of the interference proceeding, from declaration of the interference itself, and formation and construction of the count through decisions on motions to dissolve or to shift status and the final award of priority.

■ Montedison contends in response, inter alia, that even assuming plaintiffs' allegations to be true, the fraud or misconduct could not have "affected" the decision of the Board of Interferences, since the award of priority to Natta et al., was based on a failure of proof by the other parties. In particular, Montedison urges that the Board's decision turned on a lack of evidence that any other party had both produced the product of the count *and* recognized its structure and utility prior to the June 8, 1954 date of Natta, et al. Since the plaintiffs contend that the Board was misled and deceived by Montedison, Montedison's argument that its success in the interference proceeding was based exclusively on the failure of the other parties' proof of earlier dates of invention does not persuade the Court that these allegations were necessarily immaterial to the Board's decision. In addition, Montedison argues with respect to its ex parte tests that the Board would not have considered the tests even if revealed fully, as they were performed nunc

---

**10.** Other claims are raised by plaintiffs which relate solely to alleged misrepresentations subsequent to the time at which those representations could have affected the award of priority, such as the filing of false declarations with respect to the completed '300 patent prosecution or the failure to produce requested documents in discovery. Those claims might be relevant to the question of when plaintiffs should have reasonably uncovered the alleged fraud, but are not relevant to the issue of the fraud itself, and consequently may not be alleged in this action.

**11.** Karl Ziegler was the German chemist who was responsible for the development of the organo-metallic catalysts used by Natta in the polymerization of propylene.

**12.** *Plaintiff Standard Oil's Delineation of the Factual Issues Relating to Montedison's Alleged Fraud in Interference 89,634 and Designation of Evidence Relating Thereto,* pp. 38–39.

pro tunc. The record is unclear as to what extent, if any, those tests were considered by the Board; the Court is further not fully convinced that the law would have precluded any consideration of such nunc pro tunc tests. Consequently, the Court does not accept Montedison's argument with respect to the materiality of its alleged fraud.

## IV. *Merits*

 Certain of the claims advanced by plaintiffs may not be raised in this proceeding because they go only to the patentability of the Natta, et al. invention, not to the priority date for any of the parties. The evidence which plaintiffs seek to introduce with respect to fraudulent representations by Montedison of the nature and scope of its relationship with Karl Ziegler and the information learned from Ziegler is relevant only to the question of originality of invention, not to the historical fact of priority of any of the parties. The fact that Natta, et al. may not be entitled to the patent because they derived the requisite knowledge or concept from Ziegler, has no bearing on whether they were the *first* inventors of this species of polypropylene. Fraud relating solely to originality of invention is outside the scope outlined in Judge Maris' opinion and may not be considered in this § 146 proceeding.

Similarly, allegations of fraudulent misrepresentations or omissions with respect to the results of comparative tests performed by Montedison are not permissible if the only relevance of those allegations is to establish the unpatentability of the Natta invention over prior art. The alleged fraud must have been with respect to test results which, if fully revealed, would have tended either to support the claimed priority date of the moving party or to rebut the claimed priority date of Natta, et al. Allegations of fraudulent misrepresentation with respect to tests performed according to patents not involved in the interference or according to the processes of other parties to the interference cannot be raised in this proceeding, unless the moving party can show that the allegations are relevant to *its priority* date or Natta, et al.'s *priority* date.

 As a matter of discretion, this Court will not permit plaintiffs to amend their complaints to include allegations of "brainwashing" or improper influence of examiners. The basis of plaintiffs' claims is that Montedison intentionally employed a strategy of approaching the examiners in ex parte, unrecorded interviews in an attempt to circumvent the inter partes proceedings in interference. Defendant was entitled, however, to approach the examiners on an ex parte basis with respect to the issues involved in the prosecution of the divisional '300 patent application.[13] As that application was closely related to the parent application in interference, many of the representations and arguments made ex parte would necessarily overlap with the issues then in interference. It would be illogical to expect the applicant or the examiners involved in the '300 application to exclude all consideration of the interference, especially since, early in the prosecution, the examiner raised the question of whether the divisional application should be included in the interference. The fact that plaintiffs were not given the opportunity to respond to each and every argument made by defendant which was relevant to the issues of the interference does not constitute such manifest injustice as would warrant introduction of alleged abuse at this late date. In view of the complexity of the record and the questions presented in this review, introduction of such conclusory claims would serve only to confuse the primary issues. However, where plaintiffs' proposed amendments allege specific misrepresentations of material fact, as outlined *infra*, as opposed to vague assertions of

---

13. The patentability of the '300 patent claims and the validity of permitting Montedison to file the divisional application are not at issue here. Those were questions which should have and could have been raised in the infringement litigation, and which may be raised at some later date by others, not party to the '300 litigation, in a suit on the '300 patent. The only issues germane to this proceeding are the allegations that Montedison improperly used the '300 prosecution in order to influence the interference proceedings.

improper influence, the Court will permit such amendments.

After a careful review of the record, the Court concludes that the interests of the parties and the efficient administration of justice would be best served by allowing plaintiffs to amend their complaints to include a limited number of specific allegations of fraud. Plaintiffs will be permitted to amend to include: (1) actual instances of fraudulent misrepresentations or failure to reveal results of comparative tests performed by Montedison according to the processes of the other parties in interference; and (2) fraud and inequitable conduct in connection with the presentation and characterization of samples of "crude" polypropylene to the Patent Office. These alleged misrepresentations must be false or misleading statements (including failures to reveal) with respect to issues of material fact, not merely argument, made either during the interference proceeding or during the prosecution of the divisional application. As discussed *supra*, the allegations must be material to the moving party's case-in-chief or rebuttal. Each party can include allegations of such fraud going to the priority date of *its* own invention or to the priority date of Natta's invention.[14] A party cannot include allegations of fraud with respect to the invention of another plaintiff or of an inventor not in the interference, if such fraud is relevant only to the patentability of the invention to Natta.

Specifically, the parties will be permitted to amend their complaints in the following fashion:[15]

1. Phillips Petroleum can amend to include allegations of fraud with respect to the repetition by Montedison of the process of the 1953 Hogan and Banks' application and presentation of samples purporting to represent the Hogan and Banks' crude polypropylene.

2. du Pont can amend to include allegations of fraud with respect to repetition by Montedison of the Baxter process, and presentation of samples purporting to represent the Baxter crude.

3. Standard Oil can amend to include allegations of fraud with respect to repetition by Montedison of the Zletz process, and presentation of samples of the Zletz crude. Standard Oil may include allegations with respect to repetition by Montedison of the Field-Feller patent only insofar as it tends to establish an earlier priority date for Zletz.[16]

The Court has chosen to permit amendments to include these limited allegations for the following reasons: First, the record demonstrates that there are substantial material issues of fact which can be resolved only after a factual hearing. Second, plaintiffs might otherwise be effectively foreclosed from litigating those issues. Although much of the relevant evidence was uncovered in 1971 and 1972, coinciding with the final decision of the Board and prior to the granting of the patent to Montedison, as a practical matter, it was not discovered until after the time at which it could have been accepted or considered by the Board of Patent Interferences. The settlement of the '300 infringement litigation foreclosed the possibility of a prompt hearing and resolution of many of the issues which would have been raised in those actions.[17] Third, the specific issues identified above

---

14. As the decision of the Board of Patent Interferences points out, no party is seriously contending that the disclosures of the June 8, 1954 Italian application do not support the count.

15. Plaintiffs are not hereby relieved of the burden of establishing, at the factual hearing, that the alleged fraud and misconduct which this Court will permit to be raised was in fact material to the decision of the Board of Interferences.

16. The record indicates that at one point, Montedison relied on an affidavit executed by Pro-

fessor Natta with respect to the results or repetitions of the Field-Feller patent in support of a motion to dissolve the interference as to Zletz. Insofar as the use of that affidavit tended to dispute Zletz's claim to prior reduction to practice, any fraud practiced in connection with the presentation may be admitted.

17. Because of the interdependence of the '300 patent and the application in interference, many of the issues which would have been raised and decided in the infringement actions are also relevant to the present case. The plaintiffs bear the burden of showing, however,

may be more expeditiously resolved at this trial, since much of the relevant evidence will be presented in any event. The results of comparative tests performed by Montedison, for example, might well be introduced as part of plaintiffs' cases-in-chief, in support of their individual contentions of prior invention.[18]

The plaintiffs will, therefore, be allowed to amend their complaints to allege the specific contentions outlined *supra*. The Court has considered carefully the arguments of counsel, and finds that no other allegations of fraudulent or inequitable conduct by Montedison may be raised. Since plaintiffs' proposed motions do not separate out the specific issues which this Court will permit them to raise, the motions to amend are once more denied, but with leave to amend consistent with the holding of this Opinion.

## OPINION

### ON MOTION FOR CLARIFICATION AND REARGUMENT

Defendant, Montedison, has moved for clarification and reargument of this Court's February 25, 1977 decision denying plaintiffs' Motions to Amend, but granting leave to amend to allege certain specific instances of fraud before the Patent Office.[1] The

present motion is addressed to that part of the February 25th Opinion which applies the discretionary considerations outlined by Judge Maris in *Standard Oil v. Montedison, S.p.A.*, 540 F.2d 611 (3rd Cir. 1976).[2] Montedison claims that it was prejudiced because it was denied the opportunity, on this round of proceedings, to present its position and evidence on the factors relevant to this Court's exercise of discretion. Apparently Montedison understood the Court in the hearing of August 17, 1976 to mean that two sets of briefings and hearings would be held prior to decision: the first to specify the evidence relied on by plaintiffs in support of their fraud allegations, and the second to argue the relevant discretionary considerations. The Court did not foresee any need for a second round of argument to consider the discretionary factors in view of the extensive record already compiled on the plaintiffs' motions to amend.[3] In the interest of avoiding any possible prejudice to the parties and of completing the record in this case, however, defendant's motion for reargument and clarification was granted. The Court requested and received a full briefing on the issues raised by defendant. Oral argument was heard on April 14, 1977.

The primary issue presented on reargument is whether this Court's evaluation of

that the issues raised here are relevant to this § 146 proceeding, and not an attempt to interject issues which were relevant only to the '300 case. See n. 13, *supra*.

**18.** The preliminary pre-trial order notes, for example, that evidence of tests run by Montedison on Phillips' and Standard Oil's applications and the Field-Feller patent will be presented by one or more of the parties as part of their cases-in-chief.

**1.** *Standard Oil Co. v. Montedison S.p.A.*, 431 F.Supp. 1064, (D.Del., filed February 25, 1977).

**2.** Plaintiffs' motions to amend are before this Court on remand. When the motions were originally filed in 1975, they were denied by this Court on the ground that no issue not presented to the Board of Interferences could be raised in a § 146 action. The Third Circuit reversed and remanded, holding that the Court, in its discretion, may allow fraud to be raised for the first time in the § 146 action. Judge Maris' opinion lists several discretionary fac-

tors which the Court may consider, inter alia, in the exercise of its discretion. See 540 F.2d at 617. For a fuller discussion of the present posture of the case, *see* this Court's Opinion of February 25, 1977, *supra*.

**3.** The arguments raised by Montedison on this motion were fully aired, for the most part, at the time the motions to amend were first raised before this Court in 1975. *See, e. g.*, Montedison's Memorandum in Opposition to Motions of Standard Oil and Phillips to Amend Their Pleadings (April 15, 1975); Montedison's Memorandum in Opposition to Motion of Du Pont to Amend its Complaint in Civil Action No. 4323 (May 5, 1975); Transcript of Hearing before Wright, J., May 9, 1975, pages 26–35, 36–51, 62–66, 74–80, 92–93; Transcript of Hearing before Wright, J., June 12, 1975, pages 6–13, 22–24, 54–63. In addition, the issues were fully briefed and argued before The Third Circuit on appeal.

the availability to plaintiffs of relevant evidence during the pendency of the interference accords with the standard enunciated by Judge Maris and with the factual record. Among the several discretionary factors suggested by Judge Maris for this Court's consideration was:

. . . whether there was suppression, bad faith or gross negligence on the part of the plaintiff in failing to raise the issue of fraud before the Board of Patent Interferences or whether, on the other hand, the evidence of such fraud was not then reasonably available to him. 540 F.2d at 617.

In the February 25th Opinion, this Court commented on the relative availability of the evidence to plaintiffs:

Although much of the relevant evidence was uncovered in 1971 and 1972, coinciding with the final decision of the Board and prior to the granting of the patent to Montedison, as a practical matter, it was not discovered until after the time at which it could have been accepted or considered by the Board of Patent Interferences. 431 F.Supp. at 1072.

As a preliminary matter, Montedison urges that this Court erroneously applied the standard set out by Judge Maris:

However, the correct legal standard for deciding whether or not to permit new issues to be pleaded in a 35 U.S.C. § 146 proceeding, according to the Opinion of Judge Maris, is not whether "much" of the evidence underlying such issues would have been accepted or considered by the Board of Patent Interferences but, instead, whether or not evidence sufficient to *raise* the issues were reasonably available during the interference. Defendant Montedison's Memorandum in Support of its Motion for Clarification and Reargument under Local Rule 16, and for Further Proceedings, at 10.

■ The distinction urged by Montedison is one without difference; the above quoted language from the Maris opinion does not set forth separate discretionary considerations. Rather, the phrases "suppression, bad faith or gross negligence" and "reason-

ably available" are merely two sides of the same coin. If the evidence available to plaintiffs during the pendency of the Interference was such that a responsible attorney, acting in good faith, would have raised an issue of fraud before the Board of Interferences, but did not do so for reasons of strategy or otherwise, the Court may exercise its discretion by refusing to allow that issue to be raised here. On the other hand, if a responsible attorney would not have raised the issue of fraud based on the evidence then reasonably available to him, through the exercise of due diligence, his failure to do so is not "suppression, bad faith or gross negligence", and the Court may in its discretion allow that issue to be raised here.

Montedison contends that the Court should refuse to allow introduction of the fraud issue if plaintiffs could have raised those issues before the Board of Patent Interferences, even though the proffer almost certainly would have been rejected based on the evidence "then reasonably available". This standard is inconsistent with the language of Judge Maris' opinion in that a failure to raise the issue in those circumstances would not be "suppression, bad faith or gross negligence". Moreover, the standard sought by Montedison would not further the policy underlying the Maris opinion of encouraging the introduction of new issues as early as possible, because it would provide an incentive for an attorney to raise issues which appear frivolous at the time. The Court can see no benefit in encouraging responsible attorneys to raise issues without reasonable belief that the issues are meritorious and that evidence in support will be accepted and considered by the tribunal.

■ The failure to raise the fraud issue before the Board of Patent Interferences is not to be evaluated in a vacuum. The Court's mandate is to evaluate the available evidence from the perspective of the attorneys involved in the interference at the time, taking into consideration the complexity of the case, the state of the law at that time, and the limitations of the interference

proceeding. Only by taking into account these "practical matters" can the Court determine whether the previous failure to raise the issue should preclude its being raised now. The question, therefore, is not whether, during the interference, plaintiffs possessed certain selected pieces of evidence which now, in the context of other evidence which became available at a later time and with the benefit of hindsight, form part of their fraud case. Rather, the question is whether, given that evidence, a reasonable attorney would have raised the fraud issue before the Board of Patent Interferences.

The "suppression, bad faith or gross negligence" standard, articulated by Judge Maris is similar to the standard for admissibility of new evidence in a § 146 action set out in *Kirschke v. Lamar*, 426 F.2d 870 (8th Cir. 1970), and *Eastman Kodak Company v. E. I. du Pont de Nemours & Co.*, 284 F.Supp. 389 (E.D.Tenn.1968).[4] There are significant factual differences between those cases and the present case, however, that must be borne in mind. *Kirschke* and *Eastman Kodak* concerned the standard for admissibility in a § 146 action of certain *evidence* not introduced during the interference proceedings. The evidence was sought to be introduced in support of issues already in the case. The factual inquiry, therefore, centered on whether the moving party knew or should have known, with the exercise of due diligence, of the evidence during the interference. Here, the inquiry involves assessing both plaintiffs' knowledge and judgment: based on the evidence produced to them while the interference was pending, should plaintiffs have pleaded an entirely new *issue* in the interference. The Court must look to the totality of the circumstances, avoiding the temptation to use hindsight, to determine whether plaintiffs should have raised the issue of fraud before the Board.

█ In determining whether plaintiffs were guilty of any suppression, bad faith or gross negligence, the Court must consider more than the evidence available to plaintiffs during the pendency of the interference. An equally relevant inquiry is what evidence was not available to plaintiffs until after the close of the interference proceedings. Plaintiffs admit that they possessed certain key documents in 1969 or earlier.[5] For the most part, those documents reveal that Montedison made certain representations to the Patent Office in the prosecution of the '300 patent, or to the Board of Interferences, with respect to the characteristics of the polypropylene produced by the other parties to the interference. The Toulmin affidavit, for example,[6] which was filed in the '300 application, purported to record results of tests run by Dr. Natta and others on behalf of Montedison according to the applications in Interference. In Peake Exhibit 37, Mrs. Patricia Peake, a patent agent representing Montedison before the Patent Office, reported to Montedi-

---

**4.** In *Kirschke v. Lamar*, the language used was "a deliberate, intentional, or willful withholding or suppression of pertinent and available evidence". 426 F.2d at 874. The court in *Eastman Kodak* considered whether the moving party had been "grossly negligent" in failing to secure relevant evidence while the interference was pending. 284 F.Supp. at 395.

**5.** For example, the Toulmin affidavit, which was filed with the Patent Office during the prosecution of the '300 application became available to all parties when the '300 patent issued in 1963. Baxter Cross-Exhibit 95 was introduced into evidence in the interference by Du Pont in 1969. Phillips introduced the Hogan & Banks Cross-Exhibit 11 into evidence in the interference in 1969. The Mazzanti affidavit was filed in the interference in 1962, while the Natta affidavit, which was filed during the original ex parte prosecution of the application in interference, became available with the declaration of the interference in 1958.

There is a dispute over when Peake Exhibit 37, dealing with the presentation of samples to the Patent Office, was available to the parties. The document was evidently produced as part of the large production in November, 1969, but misplaced in the Du Pont files until 1975. The same document was apparently produced to Du Pont and made available to the other parties under a different production number in January, 1972. It is unclear whether copies were also furnished to Standard and Phillips prior to that time. For the purpose of this motion, the Court will consider Peake Exhibit 37 as available to the parties by 1969 or 1970.

**6.** Attached to Montedison's Memorandum in Support of Its Motion as Exhibit A.

son that she had exhibited and discussed with the Examiner in the '300 prosecution certain samples of the polypropylene produced according to the processes disclosed in the applications in Interference. In order to substantiate suspicions of fraud, however, plaintiffs had to know not only what representations were made, but that those representations did not accord with the results obtained by Montedison. Neither exhibit, on its face, indicates that any of the representations were inconsistent with results actually obtained by Montedison scientists. Plaintiffs knew that Montedison had represented to the Patent Office that reproductions of the applications of the parties in interference had not yielded the crystalline product of the count. What they could not know from the face of those exhibits was the alleged falsity of those representations: namely, that the reproductions relied on by Montedison had in fact yielded a crystalline polypropylene meeting the count. Similarly, there are no "smoking guns" among the other documents which Montedison claims were available to plaintiffs in time to raise the fraud issue in the interference.[7]

Plaintiffs' task was complicated by the complexity of the fraud alleged, which occurred not only during the Interference, but also during the ex parte prosecution of the '300 patent. The gaps in plaintiffs' fraud case were not filled until depositions of key Montedison personnel were taken in 1971, 1972, 1973 and 1974[8] and key underlying documents and laboratory data finally produced in 1971 and 1972.[9] In retrospect, the outline of the alleged fraud may have been present in those documents prior to 1971. Since plaintiffs' attorneys were operating without the benefit of hindsight, however, the Court does not find that failure to raise the fraud before the Board constitutes suppression, bad faith or gross negligence.[10]

■ While the interference was drawing to a close, Phillips and Standard's wholly-owned subsidiary, Amoco, did raise fraud allegations against Montedison in the '300 infringement litigation.[11] As some of the fraud now alleged by plaintiffs relates to the same underlying data and to representations made during the ex parte prosecution of the '300 application,[12] Montedison argues that the issue could also have been

---

**7.** Primary among those documents are (1) the Mazzanti and Natta affidavits, neither of which discloses on its face that the representations made were fraudulent; and (2) Baxter Cross-Exhibit 95 and Hogan & Banks Cross-Exhibit 11 introduced in the interference, neither of which could be said to substantiate a specific *allegation of fraud without significant further* discovery.

**8.** As is evident from the specifications of the evidence in support of fraud, plaintiffs rely heavily on the following testimony:
Depositions of Mrs. Patricia Peake, taken December, 1971 and April-May, 1972.
Deposition of Dr. Moretti, taken June-July, 1972.
Depositions of Dr. Pirani, taken March, 1970; November-December, 1972; February-May, 1973.
Deposition of Dr. DeVarda, taken November-December, 1973.
Deposition of Dr. Mazzanti, taken September, 1974.

**9.** Several of the most significant documents offered in support of plaintiffs' fraud allegations were not produced until 1972, including Peake Exhibit 36 (produced to Du Pont 1/72); and Pirani Exhibit 226 (produced 4/72).

**10.** Nor does the Court find that Standard Oil was guilty of any suppression in allegedly failing to seek discovery on the fraud issue while the interference was pending. An attorney could be guilty of a lack of due diligence if he was aware, or should have been aware, of the existence of pertinent evidence but failed to use reasonable efforts to make that evidence available on behalf of his client. *See, Kirschke v. Lamar, supra.* Montedison has not demonstrated to the satisfaction of this Court, however, that Standard Oil's attorneys should have been aware at the time of the existence of evidence establishing a case of fraud against Montedison in the interference.

**11.** Amoco pleaded fraud with respect to representations of prior art in its answer in 1967, on information and belief. Phillips raised general allegations of fraud in its answer in October, 1969, and particularized it to some extent in an answer to an interrogatory in December, 1970.

**12.** For example, the alleged fraud with respect to the representations made in the Toulmin affidavit and those reported in Peake Exhibit 37, is relevant both to the '300 actions and to the interference.

brought to the attention of the Board of Interferences prior to final decision. In view of the difficulties plaintiffs would have encountered in trying to raise the issue in the Interference, this Court does not find that their failure to allege fraud simultaneously before the Board constituted suppression, bad faith or gross negligence.

The late stage of the proceedings made it difficult to raise a completely new issue before the Board. The motions period, during which any party could move the Primary Examiner to strike the application of another party on the grounds of failure to make the count, lack of patentability, etc., ended in June, 1962 with the Examiner's Decision on Motions.[13] Each of the junior parties then took extensive testimony-in-chief before the Board, which was completed on March 11, 1966. Until May, 1969, the parties were involved in discovery and protracted ancillary enforcement proceedings in the federal courts. When proceedings in the Patent Office resumed in 1969, Natta (Montedison's assignor) was granted a special period in which to present rebuttal testimony to the Board.[14] Zletz (Standard's assignor) took rebuttal testimony on February 10, 11 and 13, 1970; Hogan (Phillips' assignor) took rebuttal testimony on March 6, 1970. The final hearing was held on October 28 and 29, 1970, and the decision rendered thirteen months later on November 29, 1971.

Several of the documents claimed by Montedison to be most relevant[15] were produced in November, 1969 under court order. In order to present a new issue at that time, plaintiffs would have had to request a reopening of their cases-in-chief under Rule 243, then in force, which required "satisfactory proof" of any facts accompanying the motion.[16] In September, 1969, Du Pont was successful in obtaining a limited reopening on the issue of an inventorship discrepancy, but only after submitting to the Board extensive memoranda and supporting evidence establishing a prima facie case.[17]

Moreover, until the decision of the CCPA in *Norton v. Curtis*, 433 F.2d 779, 57 CCPA 1384 (1970) came down in November, 1970,[18] fraud was considered not to be ancillary to priority and, therefore, not relevant in an interference proceeding. Presumably plaintiffs could have filed a Rule 56[19] motion with the Commissioner of Patents to have the Montedison application stricken for fraud, as did the plaintiff in *Norton v. Curtis*. The fraud in *Norton v. Curtis*, however, involved a straightforward allegation of misrepresentation made during the ex

13. Those motions, however, could be renewed before the Board at final hearing.

14. That testimony was presented on three occasions; between October 7 and December 8, 1969; on December 29, 1969; and on April 17, 1970.

15. I. e., Peake Exhibit 37; Baxter Cross-Exhibit 95.

16. Rule 243 provided that:
"*Motions before the Board of Patent Interferences.*
Motions relating to matters other than those specified in [Rule 231] will be determined by a patent interference examiner or by the Board of Patent Interferences, as may be deemed appropriate. Such motions shall be made in writing and shall contain a full statement of the action sought and the grounds therefor, and satisfactory proof of any facts required must accompany the motion. Oral hearings will not be held except on order of a patent interference examiner or Board of Patent Interferences.

Briefs or memoranda in support of such motions shall accompany the motion. Any [reply] to the motion, together with any brief or memorandum in support thereof, shall be filed within [ten days] unless some other date is set by the patent interference examiner."

17. *See*, Supplemental Memorandum of Du Pont respecting Reargument of Matters decided in the Court's Opinion of February 25, 1977 (March 29, 1977), p. 9.

18. Rehearing was denied February 11, 1971.

19. Rule 56 of the Patent Office Practice Rules provides:
"Any application signed or sworn to in blank, or without actual inspection by the applicant, and any application altered or partly filled in after being signed or sworn to, and also any application fraudulently filled in or in connection with which any fraud is practiced or attempted on the Patent Office, may be stricken from the files."

parte prosecution of one of the applications involved in the interference.[20] The fraud allegations plaintiffs seek to raise now are more complicated, as they involve the interference itself as well as the ex parte prosecution of the related '300 applications and require sorting out and piecing together a monumental record. Further, the evidence produced in support of the *Norton v. Curtis* fraud allegations was far more substantial than that available to plaintiffs at the time.[21] Neither Phillips nor Amoco was able to delineate any fraud in the interference, or the specific fraud which is alleged in the present motions, until 1972, after substantial discovery in the '300 case. Given the late stage of the proceedings, the pre-*Norton v. Curtis* refusal of the Board to hear fraud in connection with an interference, and the weakness of the fraud case then documented by the available evidence, plaintiffs would have been taking a substantial gamble if they had attempted to get consideration of the fraud by the Board. It is unlikely that any reasonable attorney would have taken that gamble on the speculative possibility that the issue would subsequently be developed during discovery in a separate action. The Court, in the exercise of discretion, will not bar introduction of the fraud issue in this action merely because plaintiffs could possibly have filed a motion during the interference which had only a negligible chance of success before the Board.

For similar reasons, the Court does not find that plaintiffs should have raised the fraud issue in a Rule 56 motion subsequent to the interference decision. The affidavit of Joseph Schimmel, a Solicitor of the Patent Office from 1966 to 1969, which was filed by Montedison in 1975,[22] states that a Rule 56 motion may be brought before the Commissioner of Patents at any time prior to issuance of a patent. Montedison argues that plaintiffs therefore could have presented the fraud to the Patent Office after the final decision in Interference and prior to the granting of the '344 patent in February, 1973. Without touching the question of whether such a motion before the Commissioner would have preserved the fraud issue for this § 146 appeal of the decision of the Board of Interferences, the Court does not find suppression, bad faith or gross negligence in plaintiffs' failure to bring such a motion. After the decision of the Board came down in November, 1971, all parties shifted the focus of their efforts to the then-pending infringement actions. The fraud case against Montedison relevant to those infringement suits was just then beginning to crystallize. The fraud case relating to the interference was not well developed or documented until late 1973 or 1974, when the later depositions, including Mazzanti's, were taken in Italy. A Rule 56 motion is a somewhat extraordinary action, since it is brought outside of the routine examination procedure. In order to bring a meritorious motion under Rule 56 prior to the issuance of the '344 patent, plaintiffs would have had to present to the Commissioner a substantial showing of fraud material to the Natta application. Seen from the perspective of the parties at the time, plaintiffs' failure to do so does not warrant a complete exclusion of the fraud issue in this action.

■ Plaintiffs are not barred by the settlement of the '300 litigation from rais-

---

**20.** The allegations in *Norton v. Curtis* centered on claimed representations made in an affidavit presented to the ex parte examiner and in interviews with the examiner with respect to the applicant's finding of superiority of glass-coated glass fibers over plastic-coated fibers for light transmission.

**21.** In *Norton*, discovery was taken on the fraud issue during the interference. The moving party submitted substantial evidence in support of the fraud allegations, including actual fibers tested, remarks made by Curtis in a draft speech and published articles about the effectiveness of plastic-coated fibers, and a patent issued to a collaborator of Curtis disclosing plastic-coated bundles as efficient in the transmission of light. Even in the face of this evidence, however, the CCPA found that Curtis had not committed any fraud.

**22.** Court Paper No. 85, Consolidated Civil Action No. 4319.

ing the fraud issue at this point. The settlement agreements were without prejudice to the parties' rights to raise fraud in this proceeding.[23] While the fraud allegations made in the '300 litigation overlap to some extent with that alleged here,[24] most of the allegations here involve misrepresentations made to the Examiner in Interference or to the Board of Interferences. Those representations were not at issue in the '300 litigation. Further, the ultimate issue in this proceeding is different from that raised in the '300 actions. Under the terms of Judge Maris' opinion and this Court's February 25th Opinion, plaintiffs may allege fraud stemming from the '300 prosecution only if that fraud could have "infected the interference proceeding".[25] Only "[i]f plaintiffs can establish that the fraud or misconduct allegedly committed during the '300 patent prosecution possibly could have affected the ultimate decision on priority,"[26] may that fraud be alleged here. The priority of invention was not at issue in the '300 actions. Since the '300 prosecution was a separate proceeding from the interference, plaintiffs will bear a heavy burden of establishing at trial that specific fraud committed during that prosecution was in any way material to the decision of the Interference Board. The fact that these allegations were raised in a different context, for a different purpose, however, does not bar plaintiffs from raising them now.

The question of whether any of the fraud allegations should be permitted to be raised in this § 146 proceeding has been committed to the sound discretion of this Court. The Court realizes that, to some extent, it has had to "gnaw the bullet" in the face of its 1975 denial of the motions to amend. The February 25th decision to allow plaintiffs to introduce a few very specific allegations of fraud was made only after careful consideration of all of the evidence plaintiffs seek to use in support of their allegations. The allegations which may be raised are severely limited in scope. Only that fraud relevant to the priority date of the applications in interference, which involves certain specific alleged misrepresentations in the Patent Office with respect to work performed by Montedison can be alleged at this late date.[27] The focus of this reargument—the availability of the relevant evidence—is only one of the discretionary factors taken into consideration by this Court. The primary purpose of allowing those limited amendments to be made at this point is to afford the parties an opportunity for a full and fair hearing on what this Court regards as very serious allegations. The Court will not be satisfied that no manifest injustice will result to the parties or the public until the truth of the allegations is revealed at trial. Accordingly, this Court's decision of February 25th stands unchanged.

**23.** The Montedison-Amoco settlement agreement, for example, stated at p. 13 that the agreement and the order of dismissal were:

> . . . without prejudice to any claim or contention whatsoever that may be made or relied upon by the Standard Oil Company (Ind.) in *Standard Oil Company v. Montecatini Edison*, Civil Action No. 4047, U.S. District Court, District of Delaware (Interference No. 89,634).

**24.** *See* fn. 12, *supra.*

**25.** 540 F.2d at 617.

**26.** 431 F.Supp. at 1076.

**27.** *See* 431 F.Supp. at 1078.