STANDARD OIL COMPANY (INDIANA)

v.

MONTEDISON, S.p.A., a corporation of Italy, Phillips Petroleum Company, a corporation of Delaware, and E.I. du Pont de Nemours and Company, a corporation of Delaware.

**Appeal of STANDARD OIL COMPANY (INDIANA).**

**Appeal of E. I. du PONT de NEMOURS AND COMPANY.**

**Appeal of MONTEDISON, S.p.A.**

**Nos. 80–1553 to 80–1555.**

United States Court of Appeals, Third Circuit.

Argued April 23, 1981.

Decided Oct. 14, 1981.

358

John T. Kelton, Maxim H. Waldbaum, Darby & Darby, P.C., Thomas V. Heyman (argued), Dewey, Ballantine, Bushby, Palmer & Wood, William G. Todd, Watson, Leavenworth, Kelton & Taggart, New York City, for appellant Standard Oil Co.; George S. Spindler, Ralph C. Medhurst, Wallace L. Oliver, Chicago, Ill., Robert H. Richards, III, Richards, Layton & Finger, Wilmington, Del., Thomas F. Reddy, Jr., Gerald J. Flintoft, Stanton T. Lawrence, III, Pennie & Edmonds, New York City, Arthur G. Gilkes, Chicago, Ill., of counsel.

Earl L. Handley (argued), Legal Dept., E. I. du Pont de Nemours and Co., Wilmington, Del., for appellant du Pont; Roger A. Hines, Francis A. Paintin, Legal Dept., E. I. du Pont de Nemours and Co., Wilmington, Del., of counsel.

George B. Finnegan, Jr. (argued), Jerome G. Lee, Alfred P. Ewert, David H. Pfeffer, Stephen R. Smith, Richard C. Komson, Morgan, Finnegan, Pine, Foley & Lee, New York City, Edward S. Irons, Mary Helen Sears, Irons & Sears, Washington, D.C., Bernard M. Borish, Diane J. Sigmund, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant Montedison, S.p.A.

Harry J. Roper (argued), Sidney Neuman, Chicago, Ill., for appellee Phillips Petroleum Co.; Kenneth R. Adamo, George S. Bosy, Nicholas A. Poulos, Neuman, Williams, Anderson & Olson, Chicago, Ill., C. Waggaman Berl, Jr., Wilmington, Del., Donald J. Quigg, Phillips Petroleum Co., Bartlesville, Okl., of counsel.

Before HUNTER, SLOVITER, Circuit Judges and MEANOR,[*] District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### BACKGROUND

At issue in this case is the priority of invention of crystalline polypropylene, a plastic with considerable commercial utility and value. Among other attributes, crystalline polypropylene has a significantly higher melting point, tensile strength and heat resistance than prior products in the field. The antagonists, each claiming priority of invention of crystalline polypropylene for its assignor or assignors, are Phillips Petroleum Company (Phillips), Montedison, S.p.A. (Montedison),[1] E. I. du Pont de Nemours & Company (Du Pont) and Standard Oil Company of Indiana (Standard).

Following protracted litigation in the United States Patent Office,[2] the Board of Patent Interferences of the United States

---

[*] Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

1. Montedison is a corporation of Italy having its principal place of business in Milan, Italy. In the Patent Office phase of this litigation, the corporation was first known as Montecatini Societa Generale per L'Industria Mineraria e Chimica, then as Montecatini Edison, S.p.A. In the district court, a change of name to Montedison, S.p.A. was effected by stipulation of the parties and order of the court dated April 25, 1975.

2. Between 1953 and 1956, Montedison, Du Pont, Standard and Phillips, as well as Hercules Powder Company (Hercules), separately filed in the United States Patent Office, in the name of the individual scientists responsible for the work performed for the corporations, one or more applications for a United States patent claiming the invention of a new solid polypropylene. In 1957 a Patent Office examiner determined that the following applications sup-

Patent Office (Board)[3] concluded that the Natta group, Montedison's assignors, were the first inventors and granted invention dates to the parties as follows:

Montedison: June 8, 1954, based on the date of the filing of the Natta et al. Italian Application No. 24,227;

Du Pont: August 19, 1954, based on the date of the filing of the Baxter et al. United States Application Ser. No. 451,-064;

Standard: October 15, 1954, based on the date of the filing of Zletz's United States Application Ser. No. 462,480;

Phillips: January 11, 1956, based on the date of the filing of the Hogan et al.

ported a common patentable solid polypropylene:

Application Ser. No. 462,480, filed October 15, 1954, by Alex Zletz, assigned to Standard; Application Ser. No. 514,099, filed June 8, 1955, by Natta et al., assigned to Montedison; Application Ser. No. 523,621, filed July 21, 1955, by Vandenberg, assigned to Hercules; Application Ser. No. 556,548, filed December 30, 1955, by Baxter et al., assigned to Du Pont; Application Ser. No. 558,530, filed January 11, 1956, by Hogan et al., assigned to Phillips.

On the basis of these applications, on September 9, 1958 the examiner, pursuant to 35 U.S.C. § 135, declared Interference No. 89,634, thereby suspending the applicants' *ex parte* prosecution of their claims to the invention of the new polypropylene until the Board of Patent Interferences adjudged which applicant was the first inventor entitled to the issuance of a patent. In addition, pursuant to 35 U.S.C. §§ 119 and 120, the examiner accorded the benefit of the filing date of earlier filed applications for United States or foreign patents to the inventors as follows:

Italian Application No. 24,227, filed June 8, 1954, by Natta et al., assigned to Montedison; United States Application Ser. No. 451,064, filed August 19, 1954, by Baxter et al., assigned to Du Pont; United States Application Ser. No. 500,041, filed April 7, 1955, by Vandenberg, assigned to Hercules;

Because the Natta group's Italian application was the earliest filed of the applications accepted by the examiner as supporting the new invention, under Patent Office Rule of Practice 257, promulgated at 37 C.F.R. § 1.257, Natta et al. became senior parties in the interference proceeding, which imposed on the junior parties the burden to prove a date of invention earlier than June 8, 1954, the date of the Natta application for an Italian patent.

United States Application Ser. No. 558,-530.

Thereafter, Montedison resumed *ex parte* prosecution in the Patent Office of the Natta group's claim to the invention of crystalline polypropylene in Application Ser. No. 514,099; on February 6, 1973, United States Patent No. 3,715,344 covering the invention was issued to Natta et al.

Each of the unsuccessful parties to the interference proceeding in the Patent Office filed civil actions in January 1972, pursuant to 35 U.S.C. § 146, challenging the Board's decision.[4] The actions, which were eventually consolidated for all purposes,

On October 6, 1964, the Board terminated the proceedings as to Vandenberg and his assignee Hercules because they could not allege a date of invention prior to the date on which Zletz filed his application. *See Vandenberg v. E. I. du Pont De Nemours & Co.*, 242 F.Supp. 188, 189 (D.D.C.1965). The remaining contending parties engaged in extensive discovery proceedings, necessitating various judicial determinations. *See, e. g., Natta v. Zletz*, 418 F.2d 633 (7th Cir. 1969); *In re Natta*, 410 F.2d 187 (3d Cir.), *cert. denied*, 396 U.S. 836 (1969); *Natta v. Zletz*, 405 F.2d 99 (7th Cir. 1968); *Natta v. Hogan*, 392 F.2d 686 (10th Cir. 1968); *In re Natta*, 388 F.2d 215 (3d Cir. 1968), *overruled, Frilette v. Kimberlin*, 508 F.2d 205 (3d Cir. 1974) (en banc), *cert. denied*, 421 U.S. 980, 95 S.Ct. 1983, 44 L.Ed.2d 472 (1975); *Natta v. Zletz*, 379 F.2d 615 (7th Cir. 1967). The extensive record before the Board was finally completed in April 1970. Over 1,000 exhibits had been submitted and over 100 witnesses deposed in 18,000 pages of testimony. The Board heard oral argument at a final hearing on October 28 and 29, 1970 and issued its decision on November 29, 1971.

3. The name of the Office was changed to the Patent and Trademark Office by Act of January 2, 1975, Pub. L. 93–596, 88 Stat. 1949, amending title 35 of the United States Code. Since most of the events relevant to this case occurred in the period when the Office was called the Patent Office, that designation is used here.

4. The three unsuccessful parties filed duplicative actions in the District of Columbia and the District of Delaware. Standard's District of Columbia action was transferred to Delaware and the other two District of Columbia actions were dismissed.

were assigned to Judge Caleb M. Wright.[5] They were then stayed pending resolution of earlier-filed patent infringement suits before the same judge arising out of a different patent owned by Montedison which covered a form of crystalline polypropylene not at issue here. That litigation was settled in March 1975. Thereafter, plaintiffs in this action sought to amend their complaints to make additional allegations against Montedison including charges of fraudulent activities in the Patent Office in the prosecution of the Natta group's patent application. The denial of permission to amend was reversed by this court which held that in appropriate circumstances the district court may, in the exercise of a sound discretion, hear issues of fraud affecting the Board's decision on priority although such issues were not raised in the interference proceeding. *Standard Oil Co. v. Montedison, S.p.A.*, 540 F.2d 611 (3d Cir. 1976). On remand, the district court permitted the amendment of the complaints to add claims that Montedison committed fraud on the Patent Office affecting the Board's decision on priority. *Standard Oil Co. v. Montedison, S.p.A.*, 431 F.Supp. 1064 (D.Del.1977). The consolidated cases then advanced to trial of the issues.

During the course of the 85–day trial conducted between September 19, 1977 and May 17, 1978, the district court received, in addition to the voluminous record compiled in the Patent Office, considerable new evidence including several thousand exhibits and the testimony of a number of experts in the area of physical and polymer chemistry. On January 11, 1980, the district court issued a detailed opinion which it supplemented on February 28, 1980 when it entered the order which is the subject of this appeal. *Standard Oil Co. v. Montedison, S.p.A.*, 494 F.Supp. 370 (D.Del.1980).

The court affirmed the Board's determination of the dates of invention for Montedison, Standard and Du Pont but concluded that Phillips was entitled to an invention date of no later than January 27, 1953. Thus the invention dates awarded by the district court were:

Phillips: January 27, 1953

Montedison: June 8, 1954

Du Pont: August 19, 1954

Standard: October 15, 1954

The district court also determined that Phillips had proved that Montedison fraudulently withheld information from Patent Office examiners, and that this fraud was detrimental to Phillips' case for priority of invention in the Patent Office. It held therefore that Phillips' burden of proof, which would ordinarily require it to adduce clear and convincing evidence to overcome the Board's findings regarding the priority date, was reduced to a preponderance of evidence standard. 494 F.Supp. at 375–76. The court concluded, nonetheless, that Phillips had in fact proven its case by clear and convincing evidence. 494 F.Supp. at 435. Finally, the district court *sua sponte* reached the issue of the patentability of Phillips' product and found that the crystalline polypropylene of the interference count was useful, novel and non-obvious, and therefore patentable to Phillips. 494 F.Supp. at 454–456, reaffirmed at 456–61. The court's judgment, entered February 28, 1980, authorized the Commissioner of Patents and Trademarks to issue letters patent to Hogan et al. and their assignee, Phillips.

## II.

### ISSUE

None of the appellants claim an invention date earlier than January 27, 1953, the priority date the district court accorded to Phillips. Therefore, although each company vigorously asserts its own position and priority, our preliminary inquiry must be directed to the court's determination of Phillips' invention date. If that is sustained, we need not reach any of the other issues raised on appeal.

---

**5.** Judge Wright, who handled these cases throughout the lengthy district court proceedings, was Chief Judge of the United States District Court for the District of Delaware at the time of the assignment and took senior judge status on October 8, 1973.

The district court found that Phillips was entitled to priority on either of two bases: (1) constructive reduction of the invention of crystalline polypropylene to practice by the filing of an application for a United States patent on January 27, 1953, or (2) actual reduction of the invention to practice by the Hogan group in 1951–1952. There is some variation in the challenges of the three appellants to the district court's conclusions, but considered together they argue that the court's determination as to actual reduction to practice by Phillips was erroneous because Phillips failed to prove by admissible evidence the utility required by the law for the four products Phillips produced in 1951–52 which it relies upon for actual reduction to practice. They also contend that the district court erred in finding that in 1951–1952 Phillips recognized those four products as the invention.

The appellants further contend that the district court erred in concluding that Phillips was entitled to a constructive reduction date of January 27, 1953 based on the application filed in the Patent Office by Hogan et al. on that date. They argue that the Phillips 1953 application does not contain an adequate disclosure of utility and that it does not either describe the invention of the interference count in the language of the count or inherently disclose the invention in equivalent language. They also contend that the invention claimed in the 1953 application is not the invention of the count, and that it is not the crystalline polypropylene claimed in the Hogan group's Application Ser. No. 558,530, filed January 11, 1956, which was the basis on which those inventors became parties to Interference No. 89,-634. The appellants also challenge various of the district court's rulings on the fraud issues, and Montedison argues that the district court erred in deciding patentability as to Phillips.

After reviewing the record and considering all of the appellants' contentions, we conclude that the district court did not err in awarding priority to Phillips with respect to the invention of crystalline polypropylene based on an invention date of no later than January 27, 1953. Specifically, we affirm the district court's determination that Phillips constructively reduced the invention of crystalline polypropylene to practice on January 27, 1953, the date on which Phillips filed an application for a United States patent describing and claiming processes and products, including a novel solid polypropylene. We agree with the district court that that application, in compliance with the disclosure requirements of our patent laws, disclosed the crystalline polypropylene described in the count of Interference No. 89,634 and claimed in Phillips' application filed January 11, 1956 and that the 1953 application contained the necessary utility disclosures with respect to crystalline polypropylene.

Because of our conclusion that Phillips is entitled to priority on the basis of its constructive reduction to practice, we do not reach the appellants' contention that the district court erred in finding that Phillips had earlier achieved an actual reduction to practice. Moreover, since we agree with the district court that Phillips met the clear and convincing burden of proof ordinarily imposed on a plaintiff challenging the Board's decision in an interference, the issue of Montedison's fraud would have no effect on Phillips' entitlement to priority and we do not reach it.

## III.

## AN OVERVIEW OF THE LEGAL PRINCIPLES

### A.

#### Scope of Review

■ An action brought under 35 U.S.C. § 146 is a trial de novo; the statute provides that the Patent Office record shall be admitted in the district court proceeding "without prejudice to the right of the parties to take further testimony." See Frilette v. Kimberlin, 508 F.2d 205, 211 (3d Cir. 1974) (en banc), cert. denied, 421 U.S. 980, 95 S.Ct. 1983, 44 L.Ed.2d 472 (1975); Minnesota Mining & Manufacturing Co. v. Carborundum Co., 155 F.2d 746, 748 (3d Cir. 1946).

Nevertheless, a section 146 proceeding is governed by the strict rule that the Board's decision on priority, a "question of fact," is not to be disturbed "unless the contrary is established by testimony which in character and amount carries thorough conviction." *Morgan v. Daniels*, 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894); *Stamicarbon, N. V. v. Chemical Construction Corp.*, 544 F.2d 645, 647 (3d Cir. 1976).

As to our review of the district court, it is plenary with respect to legal issues but subject to Federal Rule of Civil Procedure 52(a) on factual matters. *Stamicarbon, N. V. v. Chemical Construction Corp.*, 544 F.2d at 648. In this case, as one would expect, the appellants contend that this court should exercise plenary review of the decision of the district court. Phillips, on the other hand, argues that the trial court's findings should be reviewed in the same manner as in any other kind of law suit. While the proper construction of a patent application ultimately presents a legal issue, *Methode Electronics, Inc. v. Elco Corp.*, 385 F.2d 138, 140 (3d Cir. 1967); *Minnesota Mining & Manufacturing Co. v. Carborundum Co.*, 155 F.2d at 749, where the district court's decision on the adequacy of the disclosures of a patent application is based on an evaluation of expert testimony, it has been held that the decision presents a mixed question of law and fact. *Hinde v. Hot Sulphur Springs, Colorado*, 482 F.2d 829, 835 (10th Cir. 1973); *see Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 547 (2d Cir. 1972), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973). The "clearly erroneous" standard of review under Rule 52(a) has been found to be particularly appropriate in cases, such as this, involving complex chemical patents. *See Ludlow Corp. v. Textile Rubber & Chemical Co.*, 636 F.2d 1057, 1060–61 (5th Cir. 1981); *see also Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 609–10, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950).

Selection of the appropriate standard of review in a patent appeal may often depend on the particular circumstances of the case. When many of the key issues involve inherency, as they do here, one may argue that all that is involved is the construction of the patent application. However, when resolution of that issue requires expert testimony because it is not susceptible to analysis by persons untrained in the intricacy of polymer chemistry, the trial court's findings do not differ in any material respect from findings in other types of cases of similar complexity. In this case, for example, the trial court had the opportunity to hear the experts testify and to observe their demeanor and response when under vigorous cross-examination; similarly, the trial court examined slides and other exhibits which were described or clarified by the experts. We believe, therefore, that under these circumstances the appropriate standard of review of all findings based in · part on expert testimony should be the "clearly erroneous" standard of Rule 52(a). Nonetheless, we have independently reviewed the record, including testimony and exhibits, and have concluded that even under a broader standard of review, the findings and conclusions of the district court should be affirmed.

## B.

### *Priority*

Generally, in determining entitlement to a patent when there are contending inventors, priority is awarded to the party who first reduced to practice a conception of the invention if all other conditions of patentability are satisfied. *See Rex Chainbelt, Inc. v. Borg-Warner Corp.*, 477 F.2d 481, 487 (7th Cir. 1973); *Grefco, Inc. v. Kewanee Industries, Inc.*, 499 F.Supp. 844, 848 (D.Del.1980), *aff'd*, No. 80–2753 (3d Cir. Aug. 3, 1981); 3 Chisum, *Patents* § 10.01 (1981).[6] Reduction to practice may be es-

---

**6.** The major exception occurs when a party who was later in actual reduction to practice can nevertheless prove that s/he conceived the invention first and exercised reasonable dili-

gence in reducing that invention to practice. *See Marconi Wireless Telegraph Co. of America v. United States*, 320 U.S. 1, 34–35, 63 S.Ct. 1393, 1408–10, 87 L.Ed. 1731 (1943). The stat-

tablished by a party either by reliance on the filing date of its application, which constitutes constructive reduction to practice, or by proof of actual reduction to practice on an earlier date. *See Kardulas v. Florida Machine Products Co.*, 438 F.2d 1118, 1120–22 (5th Cir. 1971); 35 U.S.C. § 102(g); 3 Chisum, *Patents* § 10.02.

Two statutory provisions stretch backward the date of constructive reduction of an invention to practice. Under section 120, 35 U.S.C. § 120, an applicant may rely not only on the filing date of the application in which the invention is claimed but on the filing date of a previously filed United States patent application if the earlier application satisfied the statutory disclosure requirements with respect to the invention subsequently claimed. It is this provision which enables Phillips to use the date of January 27, 1953 when its assignors, the Hogan group, filed Application Ser. No. 333,576.[7] The other relevant statutory provision, section 119, 35 U.S.C. § 119, gives an applicant the benefit of the filing date of an application for a foreign patent filed not more than one year before the filing of the counterpart United States application, also assuming adequate disclosure. *Yasuko Kawai v. Metlesics*, 480 F.2d 880, 886 (Cust. & Pat.App.1973). It was this provision which enabled Montedison to rely upon the 1954 Italian application filed in the name of its assignors, the Natta group.

### C.

#### *Disclosure*

Compliance with the full disclosure requirement of 35 U.S.C. § 112, which facilitates subsequent free public use of the invention, is the *quid pro quo* for the grant of a limited patent monopoly on a patentable invention. *In re Argoudelis*, 434 F.2d 1390, 1394 (Cust. & Pat.App.1970) (concurring

opinion); 2 Chisum, *Patents* § 7.01 (1981). The requirement that a patent application must contain a full disclosure also serves to set forth clearly the scope and limits of the invention. In addition, the specification and claims of an application provide the evidence from which it can be ascertained whether the applicant was in actual possession of a particular invention on the filing date. For this reason, the disclosure requirement is considered equally applicable when a foreign application is sought as the invention date of a subsequently claimed invention, *Yasuko Kawai v. Metlesics*, 480 F.2d at 886, and when the date of a previously filed United States application is sought. *In re Smith*, 481 F.2d 910, 914 (Cust. & Pat.App.1973); 2 Chisum, *Patents* § 7.04.

Section 112 expressly provides that the specification of an application shall contain: a description of the invention, sufficient information to enable one skilled in the art to make and use the invention, and the best mode known to the applicant of carrying out the invention. 35 U.S.C. § 112. In addition, section 101 has been construed to impose the requirement of a practical utility disclosure. *Yasuko Kawai v. Metlesics*, 480 F.2d at 886; *see Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

### IV.

### INHERENCY OF THE DISCLOSURES

The invention described in the interference count at issue here is:

Normally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content.

In their attack on the district court's finding that the Phillips 1953 application

---

ute provides, "In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other." 35 U.S.C. § 102(g).

7. Although the Patent Office examiner rejected this application as unsupportive of the subject matter of the interference, he gave Phillips status as a party on the basis of a subsequent application by the same inventor group.

constituted a constructive reduction to practice of the invention described in the count, the appellants challenge the sufficiency of that application. Montedison and Du Pont challenge the utility disclosure. Montedison and Standard challenge the sufficiency of the invention description in two important respects. Although they concede that the 1953 application disclosed a solid polypropylene, they contend that it did not disclose a polypropylene "consisting essentially of recurring propylene units" or polypropylene "having a substantial crystalline polypropylene content."

## A.

### Sufficiency of Description

Turning first to the challenges made to the adequacy of Phillips' disclosure of the count invention, it is undisputed that Phillips' 1953 application does not contain either the language "consisting essentially of recurring propylene units," or the language "having a substantial crystalline polypropylene content." However, to satisfy the disclosure requirements of section 112, the description of the invention need not repeat the language of the count in haec verba but may be in any manner which adequately but necessarily communicates the invention of the count to persons of ordinary skill in the art reading the application at the time of its filing. Stamicarbon, N. V. v. Chemical Construction Corp., 544 F.2d at 652; In re Wertheim, 541 F.2d 257, 262 (Cust. & Pat.App.1976); see Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc., 607 F.2d 885, 896 (10th Cir. 1979), cert. denied, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980). The language of the application is deemed the legal equivalent of the language of the count if the necessary and only reasonable construction which can be given it is the same as the construction given the language of the count. See Wagoner v. Barger, 463 F.2d 1377, 1380 (Cust. & Pat.App.1972). The party who asserts inherent disclosure has the heavy burden of proving it. Id.

The 1953 patent application is entitled "Process for Polymerizing Olefins[8] and Catalyst Therefor." The principal feature of the inventions described and claimed in the application is the use of a "novel" catalyst, "chromium oxide deposited on . . . silica, alumina, or silica-alumina supports", in the polymerization of propylene and other olefins. The application states that the object of the polymerization reaction is to produce "novel tacky and solid polymers." Four products are produced by the new polymerization process: the total polymer; a liquid oily polymer fraction; "the tacky polymer", "the lower weight portion of the [remaining] semi-solid polymer which can be extracted therefrom, e. g. with $n$–$C_5$"; and the residue, a "solid polymer" which is "the higher molecular weight portion of the semi-solid fraction, which constitutes the raffinate or insoluble portion left from the extraction with $n$–$C_5$ or methylisobutylketone (MIBK)." Joint Appendix Vol. II, p. A854.

The application then further describes the four products, i. e., the total polymer and the liquid, tacky and solid fractions of it, obtained by the new process:

> The polymerization of propylene over this catalyst yields a product of about 2000 to 3000 average molecular weight. The molecular weight of the polypropylene produced by the process of the invention in the presence of chromium oxide supported on silica, alumina, or silica-alumina ranges from about 200 to 50,000. Our polypropylene contains about 10 to 20 weight per cent material boiling below 900°F. This fraction is an oil having an initial boiling point of about 400°F. The fraction boiling above 900°F is described best as a tacky polymer containing both semi-solid and solid polymer. The tacky polymer is semi-solid polymer soluble in pentane at room temperature and may be extracted in this manner, leaving a solid polymer fraction which is insoluble in pentane at room temperature.

---

**8.** An olefin is a hydrocarbon in which there are twice as many hydrogen as carbon atoms and only one double bond. Joint Appendix Vol. III, pp. B247, B250.

*Id.* This description of the products of the invention is followed by a statement of the utility of each, including the following:

 . . . The solid polymers and copolymers of the invention have utility in the applications where any of the solid plastics are used.

*Id.* at 855. The application then instructs as to the preparation of the catalyst and the preferred temperature, pressure and other conditions to be used in carrying out the polymerization reaction. Twenty examples are given to illustrate and clarify the invention. Finally, 33 processes for polymerizing olefins or manufacturing the catalyst are claimed as well as 17 products, including polymers and catalysts. Claim 31 reads:

 A solid polypropylene made by the process of claim 22, having a melting point in the range of 240 to 300°F, a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, and a weight average molecular weight in the range of 5,000 to 20,000.

*Id.*, p. A890. It is this product which Phillips claims is the crystalline polypropylene of the interference count.

After examination of the application, consideration of the expert testimony produced by Phillips and consideration of the evidence that six independent research groups produced a product complying with Phillips disclosures that always and inevitably conformed to the three limitations of the Count, the district court concluded "that Phillips's 1953 application disclosed crystalline polypropylene." 494 F.Supp. at 430.

1. *Polypropylene "consisting essentially of recurring propylene units."*

The object of polymerization [9] is to break the double bond joining the atomic groups constituting the molecular structure of the starting monomer, here, propylene, so that in the resulting polymer those groups are joined by a single bond and the released bond serves to form additional molecular

units. Thus, a polymer contains a greater number of molecular units than its corresponding monomer. The district court graphically described and illustrated the polymerization process with respect to the monomer, propylene, in its opinion at 494 F.Supp. at 376.

One of the distinguishing characteristics of the polypropylene of the count is that it consists "essentially of recurring propylene units." As the district court explained:

 [T]he polymerization is very orderly, resulting in the production of a polypropylene consisting of recurring propylene units:

Figure 2

This type of regular polymerization is known as head-to-tail polymerization or 1–2 addition. Its essential feature is that the first (head) carbon atoms in every propylene molecule joins with another propylene molecule by binding to its second (tail) carbon atom. One noticeable result of this 1–2 addition is that none of the methylene groups are adjacent, but are isolated from each other; another is that the pendent methyl group [sic] are also isolated in that none of them "dangle" from adjacent carbon atoms.

494 F.Supp. at 376–77 (Footnotes omitted). Since the count requires only that qualifying polypropylene consist of "essentially" recurring propylene units, it permits small variations from a predominant structure of recurring head-to-tail propylene units.

Phillips claimed and the district court agreed that the 1953 application's description of the temperature and pressure conditions under which the polymer was to be prepared from propylene inherently disclosed the "essentially recurring propylene units." The application stated:

---

**9.** References to "polymerization" throughout this opinion are to addition polymerization of unsaturated hydrocarbons as distinguished

from condensation polymerization, not relevant here. Joint Appendix Vol. III, p. B246.

The temperature to be used in carrying out the polymerization reaction depends to some extent on various factors, such as the solvent, but normally ranges from about 150 to 450°F. The preferred range for propylene and higher 1-olefins is 150 to 250°F and that for ethylene is 275 to 375°F.

. . . .

The pressure must be high enough to maintain the diluent in the liquid phase and to assure that olefins not liquified under these conditions are dissolved in the liquid phase in sufficient amount. This requires a pressure of at least 100 to 300 psig, depending on the feed and the temperature, and a pressure of approximately 500 psig is to be preferred.

Joint Appendix Vol. II, p. A856.

In reaching its conclusion of inherency, the district court relied on the testimony of Dr. Thomas G. Fox, a professor of chemistry at the Carnegie-Mellon University in Pittsburgh, Pennsylvania, who was head of the Basic Polymers Research Laboratory of the Rohm and Haas Company from 1951 to 1957 and who thereafter became supervisor of a polymer research group at the Mellon Institute for Research. Dr. Fox testified that a polymer chemist in 1953 would have recognized that a temperature of 150 to 250°F and pressure of 500 psig were "mild" conditions of polymerization. Joint Appendix Vol. III, p. B372. He testified that the polymer chemist would have expected that polypropylene obtained under such conditions would have a structure of recurring propylene units. *Id.* This testimony is supported by a 1953 publication, *Principles of Polymer Chemistry,* by Dr. Paul J. Flory, a leading authority in the field of polymer chemistry.

Montedison attempts to refute Dr. Fox's testimony by referring to prior art which it claims establishes that polymerization under milder conditions than those used in the Phillips process produced polymers having a tree-branched structure, the antithesis of a straight line, head-to-tail structure.[10] Montedison's reliance on these references appears to be misplaced. In the first place, there is ample evidence in the record that the processes involved in those prior art references could not be characterized as "mild" since they had to be conducted at extremely low temperatures. Even Montedison's expert, Dr. Cecil Bawn, refused to characterize the temperatures used in the references as "mild". Joint Appendix Vol. VI, pp. B1690, 1693, 1698. This "mildness" was, however, an essential aspect of Dr. Fox's statement that a linear polymeric structure would be expected to result from the "mild" polymerization conditions of the Phillips process. In the second place, the polymerization processes described in the references are different from the Phillips' process; for example, a different catalyst is used. The significance of this is recognized in one of the references itself, where the following appears:

Among the various monomers and various catalyst systems, however, major differences are found with respect to ease of polymerisation, side reactions, types of products, and the effects of temperature, monomer concentration and promoter concentration on the quality of the product.

Moreover, the conclusions regarding the detailed mechanisms applying in one particular monomer-catalyst system are often found to be inapplicable to other systems.[11]

10. Montedison cites United States Patent No. 2,387,784, issued October 30, 1945, to Robert M. Thomas and Harold C. Reynolds, Joint Appendix Vol. XV, p. C2084; United States Patent No. 2,474,670, issued June 28, 1949 to Arthur B. Hersberger and Randall G. Heiligmann, Joint Appendix Vol. XV, p. C2089; C. M. Fontana, "Polymerisation of 1-Alkenes with Promoted Aluminium Bromide," in *Cationic Polymerisation and Related Complexes* 121 (P.H. Plesch,

ed. 1953), Joint Appendix Vol. XV, p. C2092; C. M. Fontana et al., "Catalyzed Polymerisation of Monoalkylethylenes," in 44 *Industrial and Engineering Chemistry* 1688 (1952), Joint Appendix Vol. XV, p. C2106.

11. Fontana, "Polymerisation of 1-Alkenes with Promoted Aluminium Bromide," *supra* note 10, Joint Appendix Vol. XV, p. C2092.

Thus, even if the "tree-branched polymer structure" which Dr. Bawn testified was the structure of the polymer product of one of the references,[12] was the structure of the polymers produced by the methods of the other three references as well, those references do not compel a conclusion that Dr. Fox's statement that a linear polymeric structure would be expected to result from the mild polymerization conditions of the Phillips' process was erroneous.

Montedison and Standard argue that a reference to unsaturation in the 1953 Phillips application is inconsistent with a product structure of recurring propylene units. They stress that "unsaturation" is synonymous with double bonding in the molecular structure. The contention as to unsaturation stems from claim 33 in the Phillips application which stated:

> 33. Polypropylene in which the major portion of the unsaturation therein is trans-internal and vinyl.

From this language Montedison argues, "This presence of appreciable unsaturation is inconsistent with the requisite of 'recurring propylene units.'" Montedison Brief, p. 40.

It is, however, evident that the claim does not indicate the presence of major or "appreciable" unsaturation. Rather, the phrase is: "the major portion of the unsaturation . . ." As the district court pointed out, the application expressly disclosed that the unsaturation of Phillips' polypropylene is no more than 2.4 double bonds per molecule. The court stated, "Fox testified that since the total number of recurring units in the molecules was greater than 400, it is justifiable to conclude that a skilled polymer chemist would have known that Phillips' scientists were discussing a 'minor feature' of the structure in their polymers." 494 F.Supp. at 432 (footnote omitted). Since the unsaturation was a negligible amount, it was not inconsistent with the

limitation of the count that the product consist "essentially" of recurring propylene units.[13]

## 2. Polypropylene "having a substantial crystalline polypropylene content."

The count requires that the polypropylene have "a substantial crystalline polypropylene content." The appellants stress the conceded fact that the word "crystalline" does not appear in the Phillips 1953 application. Nonetheless, if the product was disclosed to be, in fact, crystalline in conformity with the count, the inventors' failure to appreciate the product's crystallinity, as such, does not detract from the adequacy of the disclosure. *See Miller v. Watson*, 129 F.Supp. 241, 242 (D.D.C.), *aff'd*, 229 F.2d 21 (D.C.Cir.1955). As we previously indicated, an acceptable disclosure need not be in any precise language. *See Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 436, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911).

The molecules in crystalline matter, such as the crystalline polypropylene of the count, are arranged in an orderly fashion with respect to each other and are bonded together more tightly than is the case with the random grouping of molecules characteristic of an amorphous material. Joint Appendix Vol. III, pp. B288–90. Crystallinity imparts the attributes of rigidity, strength and resistance to heat. Because the count requires that there be "substantial" crystalline polypropylene content, polypropylene containing an inconsequential amount of crystalline polypropylene is excluded.

The district court accepted Phillips' contention that the substantial crystalline characteristic of Phillips' polypropylene was inherently disclosed in the application in the recitation of the properties of its polypropylene. The specification pertaining to polypropylene states,

---

12. When questioned about this, Dr. Fox pointed out that in Fontana's article, Fontana characterized his statement as to the structure as a "hypothesis." Joint Appendix Vol. VII, pp. 2182–86.

13. In light of the minor amount of unsaturation disclosed in the Phillips application, Standard's vigorous argument based on the subsequent information provided by Phillips in connection with its British patent application misses the mark. *See Martin v. Johnson*, 454 F.2d 746, 750 (Cust. & Pat.App.1972).

The solid polymer fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240 to 300°F, a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, and a weight average molecular weight in the range of approximately 5,000 to 20,000.

Joint Appendix Vol. II, pp. A881–82. In addition, there appears in the specification the following description of a technique for measuring melting point,

The melting point was determined from a cooling curve of temperature vs. time,

which the district court construed as applicable to the polypropylene of the application.

The appellants do not challenge the general principle that disclosure of an attribute of a chemical compound, here a substantially crystalline polypropylene structure, may be accomplished by means of a listing of properties of the compound necessarily reflecting the presence of the attribute. It is clear that adequate disclosure may be by any means, since the objective is to communicate the invention to the reader who is skilled in the art. See In re Bridgeford, 357 F.2d 679, 682–83 (Cust. & Pat.App.1966). Rather, the appellants contend that the properties of the solid polypropylene given in the 1953 application, taken singly or together, would not have disclosed that the polypropylene had the characteristic of substantial crystallinity to polymer chemists reading the application in 1953.

In concluding that the 1953 application inherently disclosed substantial crystalline polypropylene the district court relied on the testimony of Dr. Fox and another Phillips expert, Dr. Bailey, as well as the repetition experiments conducted by six independent research groups. Standard and Montedison raise both general and specific challenges to this evidence. Standard argues that Fox's testimony runs counter to "what was the appreciation at Phillips in 1952." Standard's Brief, p. 40. The appropriate inquiry, however, is the understanding and appreciation of knowledgeable polymer chemists at that time, rather than only the appreciation of Phillips. Moreover, subsequent testimony is admissible to show what interpretation would have been placed on a description of an invention in an application at the time of the filing of the application. In re Lange, 644 F.2d 856, 863 (Cust. & Pat.App.1981); In re Hogan, 559 F.2d 595, 605 (Cust. & Pat.App.1977).

Standard argues, further, that the district court should not have accepted the melting point, density and intrinsic viscosity ranges set forth in the application because these ranges "were mere best guesses" by Hogan, the inventor. Hogan testified that far from being "guesses", those ranges were his estimates based on actual data, "evaluations and characterizations", made on these polypropylene products "reported back to [him]." Joint Appendix Vol. XIX, pp. E48–49. Standard does not refer us to any authority for its contention that an application which utilizes estimated ranges is defective. The precedent points to a contrary result. Krantz v. Olin, 356 F.2d 1016, 1019 (Cust. & Pat.App.1966) (citing Telephone Cases, 126 U.S. 1, 535–36, 8 S.Ct. 778, 782–783, 31 L.Ed. 863 (1888)), cert. denied, 386 U.S. 982, 87 S.Ct. 1286, 18 L.Ed.2d 230 (1967). Since Standard does not contend that Hogan's estimates were wrong, arbitrary or unreasonable, its attack on this ground must fail.

Standard and Montedison argue that the district court erred in considering the density, melting point and intrinsic viscosity data as inherent disclosure of crystalline polypropylene in that similar data in the application describes the polyethylene also claimed in it. Therefore, they continue, the description is not of a unique product. This argument ignores the fact that in the application itself the data is expressly applied to polypropylene, which necessarily distinguishes the product from polyethylene and other products. Joint Appendix Vol. II, p. A890.

a. "[I]nsoluble in pentane at room temperature."

With respect to the property of insolubility stated in the 1953 application, Fox testified that the skilled polymer chemist who in 1953 read that Phillips' solid polypropylene

was "insoluble in pentane at room temperature" would have understood: (1) that pentane was a chemically suitable solvent for dissolving polypropylene, (2) that the asserted insolubility of the polypropylene indicated that it was either cross-linked or crystalline and (3) that "insoluble . . . at room temperature" meant that the product was soluble at some higher temperature and that therefore it was crystalline rather than cross-linked since cross-linked polymers were known to be insoluble at any temperature. Joint Appendix Vol. III, pp. B290–92, B296, B368, B374–75; Joint Appendix Vol. VII, pp. B2116–18. The district court made an express finding as to (1) above, 494 F.Supp. at 415, and Dr. Fox's other two conclusions are supported by contemporaneous publications, including an article by Montedison's expert, Bawn.[14]

Montedison argues that the trial court erred in relying on pentane insolubility as being indicative of crystallinity because in a 1949 article, the authors reported their finding that an amorphous polyvinyl ether was insoluble in a solvent in which the crystalline polymer was soluble.[15] Although Fox conceded that the Schildknecht finding appeared to represent an exception to the rule that amorphous polymers are more soluble than crystalline polymers, Joint Appendix. Vol. VII, p. B2190, there is some discussion in that article itself as to whether the insolubility of the amorphous material may have been due to cross-linking. In any event, the trial court's finding of inherent disclosure of crystallinity was not based on the insolubility disclosure alone, but rather on the totality of the properties disclosed.

b. "[M]elting point in the range of 240 to 300°F"; "The melting point was determined from a cooling curve of temperature vs. time."

The Phillips application specified a "melting point in the range of 240 to 300°F."

There was agreement in the district court that only crystalline materials have "melting points" while amorphous materials may be said, by contrast, to have "second order transitions," "softening points," or "glass transitions." *See, e. g.*, Joint Appendix Vol. VI, pp. B1849–50. Also, Dr. Bawn of Montedison agreed that the distinction between "melting point" and "second order transition" was well known in 1953. *Id.* On the other hand, the record shows that the precise term "melting point" was not always scrupulously observed in the literature of the period and sometimes was used to indicate a second order transition of an amorphous material. For this reason appellants argued in the district court, as they do here, that the reference to "melting point" in the Phillips application did not necessarily disclose to skilled polymer chemists that the material being described had a crystalline content.

However, there was convincing testimony in the district court that when "melting point" was used improperly in various publications, the amorphous nature of the material in question was made otherwise evident so that no confusion as to structure resulted from the misuse of the term. *See* Joint Appendix Vol. III, pp. B452–55; Joint Appendix Vol. VI, pp. B1870–71, B1874–81, B1885–87. In addition, Dr. Bailey, a Phillips' expert upon whose testimony the district court expressly relied, testified that where the expression "melting point" was used in the literature without other qualification, it necessarily indicated, and so indicated in 1952, a crystalline transition, *i. e.*, a transition from a crystal to an amorphous form. 494 F.Supp. at 421, 431; Joint Appendix Vol. VII, p. B2226. Dr. Fox also testified that as used in the 1953 application with respect to Phillips' polypropylene, the

14. Mark & Tobolsky, *Physical Chemistry of High Polymeric Systems* 267 (1950), Joint Appendix Vol. XIII, p. C1496; Bawn, *The Chemistry of High Polymers* 136 (1948), Joint Appendix Vol. XIII, p. C1492. *See also* Joint Appendix Vol. VI pp. 1926–36.

15. Schildknecht et al., "Isomerism in Vinyl and Related Polymers", 41 *Industrial and Engineering Chemistry* at 1998 (1949).

term necessarily indicated a crystalline content. Joint Appendix Vol. III, p. B342.[16]

Furthermore, Dr. Fox's unrebutted testimony was that a melting point determined on the basis of a temperature-time cooling curve "clearly indicated that you have a crystalline polymer." Joint Appendix Vol. III, p. B374; *see also* Joint Appendix Vol. VI, pp. B1952–53. The cooling curve technique is used to discover the freezing point of a crystalline material, the point at which a molten, liquid material freezes being approximately the same as the point at which the solid material melts. Joint Appendix Vol. III, pp. B308–309, B322. A curve plotted on the basis of a series of points in time and the corresponding temperature readings at each point of the pre-heated and now cooling material shows an initial fast cooling until a plateau, a period of slow cooling which is the freezing point, is reached. Joint Appendix Vol. III, pp. B312–21. This plateau in turn is followed by rapid cooling again. With respect to an amorphous material, there is no freezing, no phase change from liquid to solid, a cooling curve shows no plateau, and the cooling curve technique, therefore, has no application. Joint Appendix Vol. III, pp. B324–28; *see* 494 F.Supp. at 414–15.

Appellants contend that the district court erred in concluding that the 1953 application disclosed that a cooling curve technique was used to determine the melting point of Phillips' solid polypropylene since the technique is not mentioned in the paragraph of the application giving the properties of polypropylene but, rather, appears at the end of the next paragraph which gives the properties of Phillips' polyethylene. The district court's conclusion was based on testimony of Drs. Fox and Bailey that readers of the application would assume that the melting points of both Phillips' polypropylene and polyethylene were obtained by the same cooling curve method. Joint Appendix Vol. III, pp. B315–16; Joint Appendix Vol. IV, pp. B848–50. Indeed, the paragraph in the application following the reference to the cooling curve states, without express reference to either the polypropylene or the polyethylene described in the preceding paragraphs, how "the weight average molecular weights" were determined. Since one must assume that this information applies to both polymers despite the absence of any reference to either of them, the district court's conclusion that the same inference must be drawn as to the language in the preceding paragraph was reasonable.

Appellants contend that *substantial* polypropylene crystallinity was not shown by the melting point and cooling curve disclosures and that the district court made no finding reversing the Board's negative finding in this respect. However, the district court specifically addressed this question and found that substantial crystallinity was disclosed based on Fox's testimony that a freezing point plateau which did not indicate a substantial amount of crystallinity would not be reported. 494 F.Supp. at 431; Joint Appendix Vol. III, pp. B412–13.

c. "[D]ensity in the range of 0.90 to 0.95."

Today, the accepted density [17] value for 100 per cent crystalline polypropylene is 0.946 g./cm$^3$ while amorphous polypropylene density is considered to be in the area of 0.85. Joint Appendix Vol. X, pp. B3904, B3915. Thus, the polypropylene density range of 0.90 to 0.95 stated in the 1953 application would today indicate, without question, substantial crystallinity. However, appellants argue that in 1953 that density range would not have disclosed a crystalline polypropylene since many amorphous materials were then known to have densities in that range and the density of amorphous polypropylene was not known.

While Dr. Fox conceded that some amorphous materials have a density higher than the range of .90 to .95, he testified that with respect to polypropylene and the density data known about the existing amor-

---

16. Dr. Fox also testified that the range of melting points indicated crystalline polymers. Joint Appendix Vol. VII, pp. B2129–41.

17. "[D]ensity is a measure of the amount of matter per unit volume in grams per cubic centimeter." Joint Appendix Vol. III, p. B345.

phous polypropylene in 1953, the high density range given in the 1953 application for Phillips' solid polypropylene would have caused polymer chemists to conclude that it was crystalline. Joint Appendix Vol. III, pp. B475–78. Dr. Fox testified that although in 1952 polymer chemists did not know the precise density of amorphous polypropylene, they could approximate it from other known information with sufficient certainty to conclude that a new polypropylene reported with a density of .90 to .95 was crystalline. Joint Appendix Vol. VII, pp. B2118–20. He also testified that a comparison of the low densities given in the 1953 application for the liquid fractions of Phillips' polypropylene with the high density given for Phillips' solid polypropylene would also cause polymer chemists to conclude that the solid polymer was crystalline. Joint Appendix Vol. III, pp. B509–12.

d. "[I]ntrinsic viscosity in the range of 0.2 to 1.0, and a weight average molecular weight in the range of approximately 5,000 to 20,000."

Dr. Fox testified that polymer chemists would have understood that the range of intrinsic viscosity describing Phillips' solid polypropylene in its 1953 application was a laboratory-measured flow time, between given points, of the polymers in solution and that the range of molecular weight given was a conservative estimate made on the basis of the measured intrinsic viscosity. Joint Appendix Vol. III, pp. B345–66. Dr. Fox testified that the polymer chemist would understand, particularly from the intrinsic viscosity figure, that Phillips' new polypropylene was an industrial polymer of high molecular weight. *Id.*, p. 367. Moreover, Dr. Fox testified, since the intrinsic viscosity can only be taken of a polymer in solution and since cross-linked polymers are not soluble, a polymer chemist would conclude that Phillips' polymer was crystalline as opposed to cross-linked. *Id.*, pp. 368–69. Because cross-linking, as well as crystallinity, may account for the insolubility of a polymer, the information in the 1953 application that Phillips' solid polypropylene was "insoluble in pentane" might have led to

the assumption that the polypropylene was cross-linked. The intrinsic viscosity data eliminated the possibility of cross-linking. Thus, this data contributed to the disclosure of crystallinity.

The district court concluded that the evidence of the significance of solubility, viscosity, density and melting point determination contributed to the ultimate finding of inherency. 494 F.Supp. at 431. Our examination of the record leads us to the same conclusion.

### B.

#### *The Repetition Experiments*

In addition to reliance on the properties of the Phillips' polypropylene set forth in its 1953 application, the district court also relied on the results of certain repetition experiments which were conducted by six independent research groups, including Montedison's and Du Pont's research scientists, during the period 1955 to 1965. The district court found that those experiments followed the disclosures in Phillips' 1953 application and that the products obtained as a result contained the necessary count structure.

Montedison and Standard contend that in admitting and crediting this evidence the district court ignored the "invariability" rule of inherent disclosure set forth in *Stamicarbon, N.V. v. Chemical Construction Corp.*, 544 F.2d 645 (3d Cir. 1976). They argue that because there were also many unsuccessful experiments by these same scientists, purportedly following Phillips' disclosures, in which remote products such as polyethylene and oil were produced, there was no invariability and therefore there could be no inherency.

The *Stamicarbon* case arose out of an interference for a patent for a urea synthesization process. The contending parties were Chemico, which claimed under the Mavrovic patent, and Stamicarbon, which claimed under the Bongard patent. Stamicarbon sought to relate the Bongard application back to the filing date of a Netherlands patent application filed earlier by

Bongard. Such relation back would not be permitted unless Bongard's Netherlands application explicitly or inherently disclosed the same process as was the subject of the Mavrovic patent application.

After deciding that the Bongard application did not explicitly disclose one of the principal elements of the Mavrovic process, this court, by a divided panel, then turned to the law of inherency and referred to the well-established rule that for inherency, it "is not sufficient that a person following the disclosure might obtain the result set forth in the count; it must invariably happen." 544 F.2d at 652 (quoting *Gubelmann v. Gang*, 408 F.2d 758, 766 (Cust. & Pat.App. 1969)). The court also stated that it must focus on the entire disclosure. The examination of the language of the patent application and the embodiments, the schematic diagrams, included in the application led the panel majority to its conclusion that the relevant portion of the Bongard application was ambiguous, and that one of the embodiments and the language of the application itself were inconsistent with the inherent disclosure on which Bongard relied.

Judge Wright distinguished *Stamicarbon* from this case on the ground that *Stamicarbon* involved a process patent, where the application must disclose a functioning process which "must work every time", whereas this case involves a product patent where "the only claim is that when the disclosed process produces a product with certain specified characteristics, that product invariably falls within the Count." 494 F.Supp. at 384. Montedison and Standard argue that the district court committed a fundamental error of law, Standard terming the court's distinction between product and process "pure sophistry." Standard's Brief, p. 34.

In considering the application of the invariability rule set forth in *Stamicarbon* and other cases cited by appellants, it is necessary to keep in mind that certain obvious difficulties inhere in imposing a requirement that repetition experiments must "invariably" produce the product of the count. Anyone familiar with laboratory experimentation is aware that many variables may affect the success of any particular experiment. *See* Joint Appendix Vol. IV, pp. B983–98. Indeed, it is unlikely that evidence of any repetition experiment would be admissible if we were to condition admissibility on the invariable success of all of the other experiments of the same series. Further, the number of experiments to run is in the discretion of the scientist. "Invariably" successful results will be more likely when fewer experiments are conducted. Therefore, the very nature of the evidence of experiments distinguishes this case from *Stamicarbon* and similar cases where the invariability rule was applied in the court's examination of the application itself to determine whether the invention claimed was the invariable result of the disclosure.

It is significant that none of the cases cited by either appellant in support·of their invariability contention involved repetition experiments.[18] Evidence of repetition experiments was credited in *Spero v. Ringold*, 377 F.2d 652, 657 (Cust. & Pat.App.1967), in the court's conclusion that the procedures set forth in the parent application "would inherently produce" the compound of the count. The court stated that the testimony showed that the compound was always present in the end product, but there was no discussion whether this conclusion was reached from invariably successful sets of experiments. Similarly in *In re Nathan*, 328 F.2d 1005 (Cust. & Pat.App.1964), the court considered an affidavit reporting the results of subsequent experiments in reaching its conclusion of disclosure of an inherent characteristic of appellants' invention without any discussion concerning possible unsuccessful results.

Evidence of failures goes to the weight of the evidence. However, when the repeti-

18. In *Wagoner v. Barger*, 463 F.2d 1377 (Cust. & Pat.App.1972), the court held the evidence of *ex parte* repetition experiments offered as evidence was relevant only to actual rather than constructive reduction to practice. Thus, it never reached the issue of invariability as applied to such evidence.

tion experiments were conducted by third parties, particularly by parties adverse to the party seeking to introduce such evidence, it would impose an impossible burden to require proof of the reason for the failure of some of the experiments. The evidence of failures was before the district court and it was stressed by both Montedison and Standard, so the court was aware of their contention of the significance of the failures.

In this case the district court did not view the evidence of the repetition experiments in a vacuum, but in conjunction with the properties disclosed in the application. These appellants contended that the disclosure of these properties, some of which were in the form of ranges, did not inherently disclose the crystalline polypropylene of the count. In examining the validity of that contention, the district court was justified in disregarding the experiments which did not produce products within those ranges. The district court, instead, focused on the results of the experiments using processes which did parallel those described in Phillips' 1953 application and produced products that fell within the given property ranges. Significantly, each of those products which did fall within the given property ranges was found to be crystalline polypropylene.[19] Under the circumstances of this case, where the use to which the repetition experiments was put related to the description in the application, we are unwilling to hold that the rule of "invariability" set forth in *Stamicarbon* precludes admitting or crediting such evidence.

Montedison contends that there was no proof in the district court that any of the products admitted into evidence satisfied all four criteria of density, insolubility, melting point and intrinsic viscosity stated in the 1953 application. While appellants stress that there were unreported properties as to many of the products admitted into evidence, the reported properties were found to conform with the description in the 1953 application. Moreover, at least six of the admitted products totally or necessarily conformed to the criteria of the 1953 application, or their reported properties varied so slightly from that criteria as to be virtually the same. *See Spero v. Ringold*, 377 F.2d at 657 n.2. The district court summarized its finding of inherent disclosure as follows:

In sum, Phillips showed that at least six experimenters attempted to duplicate its 1953 disclosures and that each of them produced a product which, insofar as its properties were measured and reported, complied with the requirements of Phillips's application. That product always and invariably satisfied the limitations of the Count. This evidence, especially when combined with the testimony of Fox and Bailey regarding the direct disclosures of the Phillips applications, convinces the Court that Phillips's 1953 application disclosed crystalline polypropylene. This finding is particularly justified by the failure of the other parties to cite a single instance of the production of a material that complied with Phillips's description that was not crystalline polypropylene.

494 F.Supp. at 430. We believe there is ample support for this finding in the record. We therefore affirm the district court's finding of inherent disclosure.

## C.

### *Utility Disclosure*

The patent law authorizes the grant of a patent only for a new and "useful" process or product. 35 U.S.C. § 101. Any consideration of the requirement that a patent application must show utility should begin with the decision of the Supreme Court in *Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). In applying that requirement to a chemical process, the Court rejected the view that a sufficient showing of utility can be made merely because the chemical process produces the in-

19. There is some irony in Montedison's position on this issue because the inventor from whom it claims the patent, Natta, published an article in 1955 which said, in the language used by Montedison's lawyer in the oral argument before us, "I found crystalline polypropylene through the Phillips' disclosure." Transcript of Argument April 23, 1981, p.23.

tended product or the compound yielded belongs to a class of compounds which are the subject of serious scientific investigation. Instead, the Court reasoned that the statutory grant of a patent monopoly is given only for "the benefit derived by the public from an invention with substantial utility." *Id.* at 534, 86 S.Ct. at 1042. The Court continued,

> Unless and until a process is refined and developed to this point—where specific benefit exists in currently available form—there is insufficient justification for permitting an applicant to engross what may prove to be a broad field.

*Id.* at 534–35, 86 S.Ct. at 1042. The Court also accepted the Patent Office's rejection of the contention that there was a sufficient showing of utility because a related compound had demonstrated utility, since there was no showing that the compound yielded by the process at issue would have characteristics and effects similar to the other compound.

Phillips' 1953 application states:

> The solid polymers and copolymers of the invention have utility in applications where any of the solid plastics are used.

The Phillips utility disclosure is thus clearly different from that considered in the *Brenner* case in several significant respects. Here there is an assertion of actual, not merely potential, benefit. Furthermore, the statement of utility is directed to the immediate practical utility of Phillips' product.

Montedison and Du Pont, however, contend that the Phillips statement of utility is too vague to be an adequate disclosure of substantial utility and rely on the holdings in *Anderson v. Natta*, 480 F.2d 1392 (C.C.P.A.1973), and *Petrocarbon Ltd. v. Watson*, 247 F.2d 800 (D.C.Cir.1957), *cert. denied*, 355 U.S. 955, 78 S.Ct. 540, 2 L.Ed.2d 531 (1958). These cases are distinguishable. The Phillips application has an affirmative state-

ment of utility, unlike the product description, "plastic-like", relied on as a disclosure of utility in *Anderson v. Natta*. Similarly, in *Petrocarbon Ltd. v. Watson*, the patent application was for a process producing polymers forming films but the application failed to disclose the use for such films. 247 F.2d at 801; *but see* Judge (later Chief Justice) Burger's dissenting opinion. *Id.* at 802. That application also stated that the polymers were useful because of their thermal stability and resistance to various fluids but failed to disclose how those properties might contribute to the polymers' utility. *Id.* at 801. Thus the court held the disclosed characteristics of the polymers did not constitute a utility disclosure. In contrast, the Phillips application contained both a statement of utility and disclosure of the properties of solid polypropylene.

The requirement that a specific utility must be disclosed is directed to one skilled in the art; that which is obvious to such a skilled person, including obvious specific utility, need not be expressly stated. *See Yasuko Kawai v. Metlesics*, 480 F.2d 880, 886 (Cust. & Pat.App.1973); *In re Hafner*, 410 F.2d 1403, 1406 (Cust. & Pat.App. 1969). *See also Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 133 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 74 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Fox testified that in 1952 the plastics industry was a well-known, fast-growing field in polymer industrial chemistry, and a polymer chemist in 1952 would have understood that a solid polymer which was said to have the usefulness of a solid plastic could be used as existing polymer plastics were then being used, *i. e.*, that it was a moldable material of high Young's modulus[20] for which many specific applications

---

20. Young's modulus is the ratio of force, per unit area, to elongation in material to which force has been applied. Joint Appendix Vol. III, pp. B264–65. Material which responds to great force applied to it with little resulting elongation is said to have a high Young's mo-

dulus. A diamond has a high Young's modulus of $10^{13}$ dynes per square centimeter and steel has a high Young's modulus of $10^{12}$ compared to rubber which has a low Young's modulus of $10^7$. *Id.* Polymer plastics have a Young's mo-

were known to exist. Joint Appendix Vol. III, pp. B256–69; B378–81; Joint Appendix Vol. III, pp. B2176–78.[21] Fox testified that among such applications were "mold[ing] a button, a poker chip, a rod, a sheet" and extruding filaments for insulation for noise and for heat. Joint Appendix Vol. VII, p. B2150. The trial court relied on this testimony in finding the disclosure of a definite practical utility.

Appellants contend that the record shows that Phillips' polypropylene was too brittle for some uses as a plastic. However, Fox testified that brittleness was known to be easily corrected with the addition of plasticizers. Joint Appendix Vol. III, p. B497. Moreover, Fox testified that even if the Phillips polypropylene was brittle, many useful applications remained. *Id.* pp. B266–73, B494–97.

■ Proof of one of the disclosed utilities suffices to meet the statutory utility requirement. *Krantz v. Olin*, 356 F.2d at 1019. *See also E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1260 n.17 (8th Cir. 1980). Therefore, Phillips argues that even if there are uses for solid plastics for which its product was unsuitable, those for which it is suitable are disclosed when its utility statement is considered together with the description of the properties of its product. It is recognized that the required utility disclosure can be met if the disclosed properties of the invention indicate the material is useful for a specific purpose. *See Ciric v. Flanigen*, 511 F.2d 1182, 1185 (Cust. & Pat.App.1975); *In re Folkers*, 344 F.2d 970, 974 (Cust. & Pat.App.1965). Fox testified that from the properties described in the Phillips 1953 application obvious specific uses would be inferred:

The properties described in Page 30 and 31 first of all describe the material as a solid material, and therefore a high Young's modulus. And that's the kind of material that you need for applications as commercial plastics. Describes a melting point in the range of 240 to 300, which means that it can be heated and softened and you can mold it. And, incidentally, that melting point is higher than the glass temperatures or melting points of the commercial polymers of the day such as polyethylene and poly—the melting point of polyethylene and the glass temperature of polystyrene, for example, and therefore would lend itself to applications at higher temperatures as a plastic than the common plastics such as polyethylene and polystyrene of 1952.

You expect to use the crystalline polypropylene as a plastic at higher temperatures than you could use polystyrene of the day or polyethylene in 1952, because they have lower melting points or glass temperatures.

The density is in a range where you're talking about a lightweight material. That's beneficial. And you have intrinsic viscosities indicating that you have molecular weights in the range of commercial plastics materials. So the properties described in the paragraph on Page 31 suggest that this would be a very interesting and useful plastic indeed.

Joint Appendix Vol. III, pp. B381–82; *see also id.*, B262–63, B383 and B495–96, Joint Appendix Vol. VII, pp. B2144–52, Joint Appendix Vol. VII, p. B2150. The court relied

---

dulus of $10^{11}$ to $10^9$. Joint Appendix Vol. VII, p. B380.

**21.** Fox testified:

If you mentioned plastic [in 1952] to a polymer chemist, there would be three things that would stand out in his mind: You talk about an industrial product, a synthetic polymer; you are talking second about a material which is rigid in the sense that a metal bar or a glass plate is rigid as opposed to a fluid or an easily extensible rubber-like material; and the third thing he would think of is that this material is capable under some conditions of being soft and able to flow, and you can mold it, under those conditions, into a desired shape, desired dimensions, shape, and then under certain other conditions, for example, if you heated it to soften it to mold it, then on cooling it would retain the shape of the molded article and would become rigid, in that sense form stable and hard to deform.

Those are the three characteristics that a polymer scientist would have immediately thought of if you talked about material that might be used as a plastic in 1952.

Joint Appendix Vol. III, p. B259.

upon Dr. Fox's analysis in rejecting the challenges to Phillips' disclosure of utility. 494 F.Supp. at 435. We agree that the utility disclosure was adequate.[22]

## V.

### MISCELLANEOUS RULINGS

■ Appellants raise a number of discrete issues relating to various evidentiary rulings made by the district court in the course of the lengthy trial. We consider only the major contentions. It is argued that Dr. Fox was not sufficiently familiar with crystalline polypropylene in 1953 to be qualified to testify as to the state of that art. We believe, however, the relevant art must be the broader one of polymer chemistry, crystalline polypropylene not having been discovered until 1953 or shortly before that date. See Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825, 829 (3d Cir. 1951). Dr. Fox appears to have been well qualified to testify with respect to polymer chemistry; moreover, the question of expert qualification is a matter peculiarly for decision by the trial judge. Id. See Seese v. Volkswagenwerk A.G., 648 F.2d 833, 844 (3d Cir. 1981).

■ Montedison argues that the district court erred in admitting the testimony of Drs. Fox and Bailey and other Phillips' witnesses without requiring Phillips to show special circumstances explaining why the testimony was not presented first to the Board. However, new expert testimony is clearly admissible in a section 146 action without such justification to the extent that it aids the court in understanding issues already presented to the Board. Minnesota Mining & Manufacturing Co. v. Carborundum Co., 155 F.2d 746, 748 (3d Cir. 1946); see Minnesota Mining & Manufacturing Co. v. Van Cleef, 139 F.2d 550, 555 (7th Cir. 1943).

■ Montedison urges that the district court erred in admitting the evidence of the repetition experiments conducted by Mont-

edison's Cappucci and Longi which was rejected by the Board as untimely submitted. The Board's rejection of the evidence of the Cappucci and Longi work on the ground that it was untimely presented may well have been influenced by its view that all such repetition experiments were inadmissible nunc pro tunc evidence in any event. However, the district court correctly overruled the Board on the question of the admissibility of evidence of subsequent repetition experiments to prove inherent disclosure of a count invention in a patent application. See Spero v. Ringold, 377 F.2d at 657–58. Even if the district court erred in admitting evidence rejected on a procedural ground by the Board, the error was harmless. The Cappucci and Longi evidence is cumulative. Other repetition evidence establishes that Phillips' 1953 application inherently disclosed the crystalline polypropylene of the count.

■ Montedison and Standard contend that the ex parte experiments of Phillips' Witt and DeLap were erroneously admitted and accorded weight by the district court. Where, as here, the party seeking to discredit ex parte tests is permitted discovery of the persons who performed them and cross-examination at trial of the witness who testifies as to the conditions of the tests and their relevance, such tests have the status of other evidence and the district court did not err in finding them persuasive on the question of inherent disclosure. See Johnson & Johnson v. W.L. Gore & Associates, Inc., 436 F.Supp. 704, 719 n.28 (D.Del. 1977); 5 Wigmore on Evidence § 1385(3) (Chadbourn rev. ed. 1974).

■ Having concluded that Phillips' 1953 application disclosed the count invention and upon consideration of the record made in the Patent Office on the patentability of the count invention, the district court determined that Phillips' crystalline polypropylene is patentable to Phillips and authorized the Patent and Trademark Office to issue the patent to Phillips as autho-

---

**22.** Although we have not attempted to treat in this opinion every argument raised by the three appellants on appeal, we have considered each of those arguments and have determined that none of them detracts from our ultimate determination that an affirmance is appropriate.

rized under 35 U.S.C. § 146. Montedison urges that this was error in that the issue was decided without having been raised or addressed by the parties. However, as the district court pointed out, the question of patentability of an invention to a successful section 146 plaintiff is not an issue which the district court may ignore. *Hill v. Wooster,* 132 U.S. 693, 698, 10 S.Ct. 228, 230, 33 L.Ed. 502 (1890); *see Sanford v. Kepner,* 344 U.S. 13, 15, 73 S.Ct. 75, 76, 97 L.Ed. 12 (1952). Moreover, following the announcement of its initial decision in an opinion issued January 11, 1980, and before entry of final judgment on February 28, 1980, the district court accepted briefing and heard argument on the issue and, in an opinion issued February 28, 1980, answered appellants' objections. No objections on the merits of the decision are raised on appeal.

For the foregoing reasons, we will affirm the judgment of the district court.